**United States District Court**
For the Northern District of California

1

2

3

4                        UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    THOMAS RACHFORD, et al.,                RELATED CASES

8            Plaintiffs,                     No. C 03-1103 PJH

9        v.                                  **FINDINGS OF FACT AND**
                                             **CONCLUSIONS OF LAW**
10   AIR LINE PILOTS ASSOCIATION,
     INTERNATIONAL, et al.,
11
             Defendants.
12   _____

13   AIR LINE PILOTS ASSOCIATION,
     INTERNATIONAL,
14
             Plaintiff,                      No. C 03-1449 PJH
15
         v.
16
     EMERY WORLDWIDE AIRLINES, INC.;
17   EMERY AIR FREIGHT CORP. d/b/a
     EMERY WORLDWIDE a/k/a EMERY
18   FREIGHT FORWARDING, INC. a/k/a
     MENLO WORLDWIDE; and CNF, INC.,
19
             Defendants.
20   _____

21   THOMAS RACHFORD, et al.,

22           Plaintiffs,                      No. C 03-3618 PJH

23       v.

24   AIRLINE PILOTS ASSOCIATION,
     INTERNATIONAL, et al.,
25
             Defendants.
26   _____/

27        On September 30, 2004, and October 1, 2004, the court conducted an evidentiary

28   hearing on the question whether Emery Worldwide Airlines, Inc. ("EWA") and the Air Line

United States District Court
For the Northern District of California

1     Pilots Association, International ("ALPA") had reached an agreement in which they settled the

2     grievance filed by ALPA on behalf of airline pilots who lost their jobs when EWA ceased flight

3     operations in December 2001.

4          At the evidentiary hearing, the parties presented witness testimony of Marcus Migliore

5     ("Migliore"), in-house counsel for ALPA; Captain Howard Attarian ("Attarian"), Executive

6     Assistant to Captain Duane Woerth ("Woerth"), President of ALPA; and Sheldon Kline

7     ("Kline"), outside counsel for EWA.[1]  In addition, the parties stipulated to the admission of

8     testimony in the form of deposition transcripts of Woerth; Captain Jeffrey Haddock

9     ("Haddock"), the Custodian for ALPA's Master Executive Council for EWA; Troy Englert

10    ("Englert"), Senior Economic Analyst, ALPA; Gene Granof ("Granof"), in-house counsel for

11    ALPA; Don Fausset ("Fausset"), former Vice-President of Human Resources and Labor

12    Relations for Emery Air Freight Corporation d/b/a Emery Worldwide ("EWW"); David Grant

13    ("Grant"), outside counsel for EWW; Eberhard Schmoller ("Schmoller"), general counsel to

14    CNF, Inc., parent company of EWA and EWW; Terry Kierce ("Kierce"), former manager of

15    financial analysis, contract administrator, and manager of compensation and benefits for

16    EWA; Ronele McCurdy ("McCurdy"), former Director of Employee Relations for EWW; and

17    Magdalena Jacobsen ("Jacobsen") the mediator at the February 5, 2003, mediation session

18    in San Francisco.[2]

19                         **BACKGROUND**

20          The background facts are more fully set forth in the court's order of May 28, 2004.

21    Briefly, EWA was formerly in the business of providing air transportation as a "common carrier

22    by air" as that term is defined in the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188.  EWA,

23    which ceased operations in December 2001, operated a fleet of freighter aircraft used

24    exclusively by EWW a/k/a Menlo Freight Forwarding.  EWA and EWW were wholly-owned

25    subsidiaries of CNF, Inc. ("CNF").

---

27       [1] Citations to the transcript of testimony from the evidentiary hearing are indicated as "Tr. at __."  The names of the witnesses are indicated in parentheses.

28        [2] Citations to deposition transcripts are indicated as, e.g., "Woerth Depo. at __."

2

**United States District Court**
For the Northern District of California

1    In 1987, ALPA became the collective bargaining representative under the RLA of the

2    pilots and flight engineers employed by EWA.  In September 2000, the EWA flight crew

3    members, represented by ALPA, entered into a collective bargaining agreement ("CBA") with

4    EWA.

5    On August 13, 2001, the Federal Aviation Administration ordered an immediate

6    suspension of EWA's operations for 60 days, citing EWA's violations of air safety regulations.

7    As a result, EWA furloughed its flight crew members.  ALPA filed a grievance concerning

8    EWA's suspension of operations ("the August 2001 grievance"), and the furloughing of its

9    flight crew members, and scheduled a System Board arbitration.  After presiding over a

10   number of hearings, Arbitrator Robert O. Harris recessed the arbitration without issuing a

11   decision so that the parties could attempt to resolve their disputes through mediation.

12   On August 27, 2001, representatives from EWA and ALPA commenced "effects"

13   bargaining, pursuant to the RLA.  The negotiations continued in September 2001 in Ohio.  The

14   purpose of the negotiations was to reach an agreement on issues related to the suspension of

15   operations and the furloughs.  See Pittsburg & Lake Erie Railroad v. Railway Exec. Ass'n,

16   491 U.S. 490 (1989).

17   On December 5, 2001, CNF announced that EWA and EWW would permanently

18   cease operating their fleet of aircraft, and that the previous layoffs of EWA flight crew

19   members would be permanent.  In January 2002, ALPA filed a second grievance (the

20   "shutdown grievance"), asserting that the December 2001 shutdown and the continued

21   furlough of all EWA's flight crew members violated the CBA.  The parties continued the effects

22   bargaining concerning the pending grievances in January 2002 in Washington, D.C., and in

23   February 2002 in Dallas, Texas, with mediator Robert Kasher.

24                      **THE FEBRUARY 2002 MEDIATION**

25   At the 2004 evidentiary hearing, the parties submitted testimony from several

26   witnesses concerning the negotiations at the 2002 Dallas mediation session.  Also admitted

27   into evidence at the hearing was the transcript of notes taken by Ronele McCurdy during the

28   Dallas mediation.  McCurdy stated that she took notes at Don Fausset's request during the

United States District Court

For the Northern District of California

1  EWA-ALPA effects bargaining sessions, from August 2001 through February 2003.  McCurdy

2  Depo. at 50-53.  McCurdy testified that Fausset had asked her "to get all the notes down that I

3  could, and to be representative of both sides of the table, and to make sure I put no emotion in

4  the notes, but to write it like I heard it."  McCurdy Depo. at 27.  McCurdy stated that she had

5  attempted to take down the exact words that were spoken, though her notes were not a

6  verbatim transcript.  McCurdy Depo. at 66.  The hand-written notes and the typed transcript

7  were authenticated by McCurdy at her deposition, and EWA placed the transcript into

8  evidence at the evidentiary hearing without objection by ALPA.[3]

9      According to Fausset, Migliore indicated during the Dallas negotiations that

10  approximately 150 to 160 pilots had advised that they didn't believe ALPA had authority to

11  settle on their behalf, and that they intended to proceed to arbitration.  Fausset recalled stating

12  several times in Dallas that EWA was seeking a "global settlement" – by which he meant "total

13  effects bargaining" or "the elimination of the labor agreement, all grievances, all arbitration

14  opportunity, waivers regarding the pilots' rights to sue, et cetera."  Fausset Depo. at 45-51.[4]

15      Migliore raised the issue in the Dallas negotiations of ALPA's authority to enter into a

16  settlement of grievances on behalf of the entire pilot group.  Exh. D-1 at 11-0251 to 11-0254.

17  Both Fausset and Kline testified that Migliore was nervous about putting ALPA at risk of a

18  lawsuit by the pilot members of ALPA.  Fausset Depo. at 40-47; Tr. at 278-284 (Kline).

19  Migliore recalled that the parties discussed waivers of litigation – but only waivers of

20  grievances, not waivers of outside claims such as tort cases or state statutory whistle-blower

21  cases.  Tr. at 384-86 (Migliore).

22      Haddock recalled only a brief discussion of the waiver issue in Dallas.  He testified that

23  ALPA had been prepared to reach an agreement that included termination of the CBA

24

25      [3] The transcript of the notes from the February 2002 Dallas session was admitted as Exh.
26  D-1 at 11-0250 to 11-0270.

27      [4] Fausset made clear, however, that while he had full authority to settle the contract issue,
    he couldn't "settle" a "legal issue" such as the effect of a waiver.  Thus, he indicated during the
28  Dallas session that it was important to obtain legal counsel before he agreed to any waiver
    language.  Fausset Depo. at 49-72.

4

United States District Court

For the Northern District of California

1  between EWA and ALPA, but not one that included waivers of grievances and civil litigation

2  against EWA.  He didn't recall ALPA abandoning its position with regard to opposing waivers

3  as a condition of settlement in Dallas.  Haddock Depo. at 24-30.

4      The parties did not reach any binding agreement in the Dallas mediation session.

5  There was no agreement regarding monetary settlements or the terms of any waiver or

6  release.  Tr. at 168, 277 (Kline).

7                    **THE PERIOD OF TIME FOLLOWING THE FEBRUARY 2002 MEDIATION**

8      Arbitrator Harris issued a final decision on December 3, 2002.  He found that the

9  August 2001 furlough of EWA's pilots was caused by circumstances beyond EWA's control,

10  and that while EWA had violated the furlough notice provision, EWA had not violated the CBA

11  itself when it furloughed its flight crew members.  He awarded ALPA $1.2 million, limited to the

12  August 2001 grievance.

13      After the issuance of the arbitration award, Kline discussed other pending issues with

14  Migliore and Granoff.  Fausset testified that Kline called him after the February 2002

15  mediation session and told him that Granof was interested in finding out whether the money on

16  the table in Dallas – somewhere between $17 and $30 million – was still available.  Fausset

17  Depo. at 101-104.  According to Kline, Granof asked whether EWA wanted to resume

18  negotiations, and whether EWA was prepared to put on the table the proposal originally made

19  in Dallas – $25 million.  Tr. at 171-172 (Kline).

20      Granof testified that he and Kline had ongoing conversations regarding the resumption

21  of attempts to settle the shutdown grievance.  Kline advised Migliore and Granof that EWA

22  sought as a precondition for any global settlement that there be a waiver and release of all

23  claims against EWA.  Kline told Granof, "We would want some form of waiver."  Granof Depo.

24  at 43-51.  According to Kline, EWA wouldn't agree to a specific amount of money at that point,

25  but was interested in further negotiation.  He stated that both Migliore and Granof were

26  receptive to the idea of a waiver and release, although neither of them "committed" to such a

27  condition.  Tr. at 174-175 (Kline).

28      Kline recalled a conversation with Migliore in December 2002 or January 2003,

United States District Court
For the Northern District of California

1   regarding "the various preconditions that the parties were so interested in as the predicate to

2   getting into the February mediation."  They discussed the waiver and release issues, and

3   Kline suggested to Migliore that there be a specific waiver and release for ALPA spelled out.

4   According to Kline, he made this proposal because both EWA and ALPA were intent on

5   constructing an agreement that would end the litigation to the extent possible, and would

6   provide for a full waiver for any future claims, and because both sides had to consider that

7   there might well be a duty of fair representation ("DFR") lawsuit as a result of any settlement

8   that was reached.  Tr. at 229-230 (Kline).

9         Granof understood that EWA was worried about lawsuits, and didn't want the pilots to

10  get money from a settlement and then use that money to fund litigation.  By "waiver," Granof

11  understood Kline to mean "the kind of settlements that I had been typically involved in" – that in

12  return for the company paying a pilot to settle the grievance, the pilot would agree to drop any

13  ongoing lawsuits or grievances.  It would be up to each pilot to agree to participate in the

14  grievance settlement, and any pilot that refused to dismiss all other complaints and grievances

15  would in effect opt out of the settlement, but could continue with other statutory claims and also

16  would be entitled to pursue the grievance.  When Granof discussed the waiver issue with Kline

17  in January 2003, he believed that they were speaking about the "typical" settlement with

18  waiver.  According to Granof, this was not the type of waiver and release that EWA eventually

19  demanded.  Granof Depo at 51-53, 73-74.

20                        **THE FEBRUARY 2003 MEDIATION**

21        The parties agreed to meet for a one-day mediation session at the Westin St. Francis

22  Hotel in San Francisco, California, on Wednesday, February 5, 2003, with mediator

23  Magdalena Jacobsen.  According to Kline, the parties chose Jacobsen because she knew

24  the parties, the agreement, and EWA and its related corporate structure, and also because

25  she was at the National Mediation Board at the time of the previous arbitration.  Both Kline

26  and Migliore were interested in having a neutral third party in the negotiations, partly because

27  Migliore had expressed concerns over a possible DFR suit.  Tr. at 175-177 (Kline).

28        EWA was represented by Fausset, EWW's former CEO; Kline and Marshall, attorneys

United States District Court

For the Northern District of California

for EWA; Grant, attorney for EWW; and Kierce, the administrator of the collective bargaining agreement between ALPA and EWA.  ALPA's lead negotiator was Attarian, Executive Assistant to ALPA President Woerth.  The other ALPA representatives were Haddock, Custodian for the Emery Pilots; ALPA attorneys Granoff and Migliore; and Englert, Senior Economic Analyst for ALPA.  Also present was McCurdy, who took notes at Fausset's request.[5]

According to Attarian, the issues to be considered at the February 5, 2003, session were the shut-down grievance, whether the ALPA-EWA CBA should be terminated, and whether the ALPA-EWA bargaining relationship should be terminated.  Tr. at 44-45 (Attarian).  Attarian later testified that the negotiators bargained over the shutdown grievance, which included negotiation of the termination of the collective bargaining agreement and the collective bargaining relationship between ALPA and EWA.  He also testified that they negotiated the amount of the monetary settlement, and agreed that ALPA would determine the allocation of the settlement funds to the individual pilots.  In addition, ALPA sought a right to re-employment for former EWA pilots in the event that EWA or any of its affiliates started up a new airline within a specified period of time.  Tr. at 47-59, 65-69 (Attarian).

Attarian also recalled that the parties discussed whether, as a condition of receiving a distribution of the settlement monies, the individual pilots would be required to execute a personal litigation waiver and release.  He was aware that there would have to be a waiver and release negotiated by both parties, which was also acceptable to ALPA, and he was aware in general terms of the scope of the proposed waiver and release, but also stated that he was not a party to those particular negotiations.  Tr. at 52-53, 69-70 (Attarian).

Attarian knew, prior to the February 5, 2003, mediation, that the waiver and release issue was something that had to be resolved and satisfied.  Attarian believed that if the issue of the waiver remained open and unresolved, it would not satisfy the terms and conditions of the agreement until it had been negotiated successfully and legally reviewed.  He believed that

---

[5] McCurdy's transcription of her notes from the February 2003 San Francisco session was admitted as Exh. D-1 at 11-0235 through 11-0270.

7

United States District Court

For the Northern District of California

1   Woerth was aware of the magnitude of the waiver and how carefully it would have to be

2   constructed.  He didn't recall any specific conversation with Woerth regarding the waiver,

3   although Woerth did charge Attarian with making sure ALPA was legally protected, so ALPA

4   would not be exposed to litigation.  Tr. at 87-97 (Attarian).

5                                      Settlement Authority

6         Fausset was the chief spokesperson for EWA, and the only EWA representative with

7   settlement authority.  He stated, however, that he always needed approval for any settlement

8   that went beyond his "parameter," although he did not describe that "parameter."  He asserted

9   that both he and Attarian said they had full authority to settle, and he believed this authority

10  existed regardless of any written statement that a settlement agreement would require the final

11  approval of the president of EWA and the president of ALPA.  He also claimed that many

12  agreements in mediation are reached on a handshake.  Fausset Depo. at 109-114.

13        Kline also testified that Fausset was lead negotiator for EWA and had full authority to

14  agree to a settlement that day.  Tr. at 180-181 (Kline).  Fausset represented EWA in the

15  negotiations with ALPA over money issues.  Kline was not personally present for any

16  negotiations between the ALPA representatives and the EWA representatives concerning

17  money issues.  Tr. 191-92 (Kline).

18        Attarian was the lead negotiator for ALPA.  Both Attarian and Woerth described

19  Attarian as Woerth's "right-hand man."  Tr. at 35-36 (Attarian); Woerth Depo. at 27.  Woerth

20  testified that Attarian's authority was to work on projects and take them as far as they could go

21  in negotiations.  However, Woerth never delegated to Attarian the power that is reserved for

22  the president of ALPA.  Woerth Depo. at 66.

23        Woerth recalled no specific discussions with Attarian regarding his authority for

24  negotiations prior to the February 5, 2003 mediation session.  Although Woerth sent Attarian

25  to San Francisco without a dollar target, he believed that the senior pilots had to get at least

26  $100,000 each or "the deal wouldn't go."  Woerth Depo. at 21-26.  Attarian says that for the

27  February 2003 negotiations, he was just told to do a "good job" and not given a monetary

28  target or floor.  Tr. at 38-39 (Attarian).

United States District Court
For the Northern District of California

1   According to Attarian, he had the authority to bring the terms and conditions to a

2   successful conclusion, to bring a proposal back to ALPA in Washington, D.C.  Tr. at 107

3   (Attarian).  He testified that although he stated that in Dallas in 2002, and in San Francisco in

4   2003, that "I always have the authority vested by the president to do the deal," this authority

5   was subject to bringing the deal back to the president for his final review and signature.  He

6   emphasized that no one at the mediation had the authority to bind ALPA to an agreement –

7   only the president of ALPA could sign for ALPA.  Tr. at 98-99 (Attarian).  "It's in our

8   constitution."  Attarian never told Jacobsen or any EWA representative that he had the

9   authority to agree to a final settlement without the final authority of Woerth.  Tr. at 107-112

10  (Attarian).

11   Migliore confirmed that Attarian had said he had the authority to proceed and get the

12  deal done, and take it back to the president.  Tr. 423 (Migliore).  Migliore also agreed that

13  under ALPA's constitution and bylaws, it is always the president's decision whether or not to

14  approve a settlement.  Tr. at 404, 412 (Migliore).  He did not believe that this requirement that

15  the president of ALPA sign any agreement was simply a "ministerial" matter.  Tr. 387-389

16  (Migliore).

17   Englert recalled that during the first meeting between Jacobsen and the ALPA

18  representatives, "it was stated" that for ALPA to negotiate a final and binding agreement, the

19  agreement would have to be approved by Woerth.  Englert Depo. at 50.

20   Granof concurred that under the ALPA constitution and bylaws, there could be no final

21  and binding settlement unless and until Woerth, ALPA's president, had reviewed the

22  agreement, it had been submitted to him with appropriate staff work, and he had signed off on

23  it.  Granof likened the process to negotiating a collective bargaining agreement – "You get a

24  tentative agreement or settlement of whatever, but it's not final and binding until, even if it's

25  reduced to writing and you know it's TA'd, until the president signs off on it."  Granof Depo. at

26  56-57.

27   According to Granof, when Attarian said, "I have the authority to get the deal done," he

28  conveyed the impression that he had the authority, that Woerth had confidence in him, and that

his recommendation to Woerth would carry considerable weight.  Granof believed that Attarian was most concerned about money, and that he was saying, essentially, that he wanted EWA to come forward with a realistic offer so they could move forward.  If EWA did that, Granof felt that Woerth had sufficient confidence in Attarian that, after legal review and proper staff review, the deal would likely be done.  Granof Depo. at 85-87.

Kline also testified that Attarian stated during the session that he had the "authority to get the deal done" or "full authority to reach a deal."  However, while Kline was aware of the provision in ALPA's constitution that only the president of ALPA had the authority to approve agreements, he stated that he believed nonetheless that if Attarian said he had authority, then he did, on behalf of the president.  Tr. at 181-182; 284-289 (Kline).

Jacobsen testified that she believed that any agreement reached by ALPA with EWA would have to be approved by Woerth.  Jacobsen Depo. at 95.

Morning Session

The mediation convened at 9:45 a.m. on February 5, 2003.  The two groups of negotiators remained in separate rooms for most of the morning, and Jacobsen moved between them.  McCurdy's notes reflect that although the parties discussed the monetary issues in general terms, neither side made a specific monetary demand or offer during that morning session.  Exh. D-1 at 11-0239 to 11-0246.

Fausset described the morning session as a "back and forth" with no concrete offer.  He stated that ALPA started at $50 million, then came down to $30-$35 million, while at the same time, EWA was at about $14 million.  Fausset Depo. at 114-116.

Englert recalled that Jacobsen came into the ALPA room on the morning of February 5, and stated that EWA was at less (in terms of a monetary figure) than they had been in the Dallas mediation.  According to Englert, everyone in the ALPA room "was just beyond disbelief."  Englert Depo. at 14-15.

Granof testified that during their first meeting with Jacobsen, the ALPA representatives discussed the number of pilots that ALPA felt might be eligible to participate in any severance funds that would be negotiated, and the effect of the decision by Arbitrator Harris.  According

United States District Court

For the Northern District of California

1    to Granof, a number of pilots "felt that they should be compensated for their entire careers" –

2    an amount in the range of $180 to $200 million.  Those pilots considered the range ALPA was

3    talking about – $30 million – to be "chump change."  Thus, according to Granof, ALPA was

4    concerned that the pilots might sue ALPA for violating the duty of fair representation by

5    entering into a settlement that was far too low.  He didn't think this was an attempt to address

6    the <u>Burley</u> issue – the issue raised by the Supreme Court's ruling in <u>Elgin, J. & E. Ry. Co. v.</u>

7    <u>Burley</u>, 325 U.S. 711 (1945) ("<u>Burley</u>") (union cannot settle grievance under Railway Labor Act

8    without consent of individual employees) – which was separate.  Granof Depo. at 64-75.

9         Granof also believed that the ALPA representatives were trying to convey that any

10   settlement should be enough to get all but a small number of the pilots to participate and to

11   agree to finality.  He did not recall any discussion with Jacobsen of what would happen to

12   pilots who decided not to accept the settlement and what their rights would be.  He knew that

13   subject had been addressed in Dallas, but didn't recall it being addressed in San Francisco.

14   Granof Depo. at 69, 73-74.

15        In Granof's view, the main issue preventing settlement was the amount of money.  He

16   felt that if the parties could not come to grips with the money issue, then there was no point in

17   discussing the other elements of the settlement.  He said that the <u>Burley</u> issue and the waiver

18   issue had been previously discussed, and had been left unresolved.  He reiterated that there

19   had been previous discussions with Kline about a waiver, but that what the company ultimately

20   demanded was not what he (Granof) had thought they meant by the traditional "waiver."

21   Granof Depo. at 79-81.

22                              <u>First Group Meeting</u>

23        According to McCurdy's notes, the ALPA representatives joined Jacobsen in the room

24   with the EWA representatives at 12:30 p.m., where the parties engaged in a somewhat

25   heated discussion until 12:57 p.m.  Exh. D-1 at 11-0243 to 11-0246; <u>see also</u> Haddock Depo.

26   at 12-13, 109; Fausset Depo. at 116.  The ALPA representatives then left the room.  The

27   parties broke for lunch from 1:00 p.m. to 2:27 p.m.

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Afternoon Session – EWA's First Offer</u>

The session reconvened at 2:27 p.m., with the two negotiating teams again in separate rooms.  According to McCurdy's notes, Jacobsen met with EWA representatives from 2:27 p.m. to 2:35 p.m.  Exh. D-1 at 11-0246 to 11-0247.  At that point, Fausset authorized Jacobsen to convey to ALPA an offer of $21.2 million – consisting of $20 million in "new money" in addition to the $1.2 million from the Harris arbitration award.  <u>Id.</u>;  Fausset Depo. at 117-118.

Fausset also gave Jacobsen a draft settlement document to convey to ALPA along with the $20 million offer.  The draft settlement document consisted of a three-page document entitled "Final Settlement Agreement Between Emery Worldwide Airlines, Inc. and the Airline Pilots Association, International," and a two-page document entitled "Settlement Agreement/ Waiver and Release."  Exh. D-3.  According to Kline, if ALPA had agreed to the waiver/ release language, the shutdown grievance would have been dismissed, and any pilot that refused to sign the waiver and release would have received no money from the settlement, and some or all of that pilot's share of the settlement funds would have gone back to EWA. Kline testified that the release was a material term of the settlement.  Tr. at 303-312 (Kline).

Grant, who had not been present for the morning session, did attend the afternoon session.  He stated that Fausset made a "series of offers" to resolve all outstanding issues between EWA and ALPA.  The first offer from EWA was $20 million.  Grant recalled that a settlement document was given to Jacobsen in conjunction with the monetary offer, part of EWA's offer designed to resolve all outstanding issues.  Grant always understood there were two components to the agreement – the agreement itself and a generic individual waiver. Grant Depo. at 47-53.

McCurdy's notes reflect that as Fausset handed the draft settlement document to Jacobsen, he told her, "We also expect them to sign a full release that Sheldon [Kline] has put together.  It is very important to us.  We understand there needs to be some tweaking between the parties."  Exh. D-1 at 11-0247.

McCurdy's notes do not indicate, however, that the EWA representatives explained to

12

1  Jacobsen that the document required a dismissal of outside lawsuits before flight crew

2  members would be eligible to receive payment from a settlement of the shutdown grievance.

3  In addition, Kline testified that he never explained the terms of the settlement and release to

4  Jacobsen, and that he did not explain the relationship of waiver to any outside litigation the

5  pilots might have.  Tr. at 302 (Kline).

6      Grant also testified that the EWA representatives did not discuss the settlement

7  document or the terms of the release with Jacobsen in any detail, but rather that they simply

8  told her they were offering the $20 million and the release document – "We gave her the

9  release document, and essentially said that was part of the deal."  He noted that Jacobsen did

10  not come back to them later and say there were any problems with the substantive terms.

11  Grant Depo. at 117-118.

12      McCurdy's notes reflect that before leaving the EWA meeting room at approximately

13  2:35 p.m., Jacobsen told Fausett that if the ALPA negotiators found EWA's monetary offer to

14  be "in the ballpark," they would need to discuss it with ALPA's president.  Fausset responded

15  that Attarian had said that if the offer was reasonable to him and to Haddock, then they would

16  take if to Woerth and he would sign off on it.  Exh. D-1 at 11-0247.

17      Kline also testified that he had asked Jacobsen to give a copy of the draft settlement

18  document to ALPA on February 4 (the day before the mediation),[6] but that she had declined,

19  telling him to give her the document the next day.  Kline then decided to give the document to

20  ALPA directly.  He claimed that he telephoned Migliore on the evening of February 4 and

21  asked to see him, and that he then delivered the document directly to Migliore in his hotel

22  room.  Tr. at 177-180 (Kline).

23                    Communication of EWA Offer to ALPA

24      Migliore disputed Kline's version of events.  He testified that he first received the draft

25  settlement document on February 5 from Jacobsen, that he did not receive a copy of the

---

27  [6] McCurdy's notes reflect that Jacobsen met with the EWA representatives from 2:45 p.m.

28  to 4:05 p.m. on February 4, 2003.  Exh. D-1 at 11-0235 to 11-0238.  According to Kline, the
purpose of the meeting was to allow the EWA team to brief Jacobsen on the issues.  Tr. at 178-
179 (Kline).

United States District Court

For the Northern District of California

1   document from Kline the previous evening, and that Kline did not come up to his room or call

2   him the previous evening.  He said Jacobsen handed him a copy at about 2:30 p.m. on

3   February 5, when she came up to ALPA's caucus room.  He recalled her saying, "Marcus, this

4   is for you and the lawyers.  This is from Sheldon [Kline].  It's a rough draft.  And you obviously

5   are going to need to talk about it, and do further work on it."  He also stated that Jacobsen

6   brought in a monetary offer at the same time, but that she did not say that the monetary offer

7   was contingent on ALPA accepting the draft settlement document without any changes.

8   According to Migliore, when he received the draft document, he "glanced at it relatively

9   quickly."  Tr. at 389-392 (Migliore).

10          Attarian recalled that when Jacobsen brought up EWA's initial offer of $20 million in

11   new money, she also had what Attarian refers to as the "rough draft waiver documents that

12   she'd been instructed to give to Marcus [Migliore] from Sheldon Kline."  The draft document,

13   which contained the waiver and release language, was handed to "one of our attorneys."

14   Attarian was not handed the document and did not know exactly what it said.  He stated that

15   there were no copies made.  Tr. at 69, 113-114 (Attarian).

16          According to Attarian, Jacobsen did not say that the $20 million in new money was

17   conditioned on the specific release and waiver terms contained in the draft document that she

18   gave Migliore.  He recalled her saying only that the document came from Kline, who  wanted

19   Migliore to have it, that it was a rough draft of the waiver language, and that the lawyers were

20   going to have to work on it.  Tr. at 89-90, 114 (Attarian).

21          Granof knew nothing about any document having been delivered to ALPA on February

22   4.  He understood that Jacobsen had delivered the draft settlement document on the afternoon

23   of February 5.  The first time Granof actually saw the document was when Migliore showed it

24   to him, towards the end of the day on February 5.  As far as Granof knew, the settlement

25   document was not discussed between ALPA and EWA.  Granof Depo. at 92-94.

26          The only document Haddock recalled ALPA receiving from EWA on February 5 came

27   as a draft agreement brought in by Jacobsen around 3:00 p.m.  Jacobsen said the document

28   had been prepared by EWA, by Sheldon Kline.  Haddock did not go through the entire

United States District Court

For the Northern District of California

document himself; instead, he looked over Migliore's shoulder during the first half-hour after they had received the document.  "Marcus had it in his possession, and there were a couple of issues that he was reading through that I looked at."  He recalled that Migliore might have "scribbled" something on the document.  He had never previously seen the document, and was not aware of anyone making any copies.  Haddock believed Migliore may have taken the document to a meeting with Grant late in the day.  Haddock Depo. at 30-36.

<u>ALPA Representatives' Phone Call to Woerth</u>

Hotel phone records produced in discovery show that the ALPA negotiating team placed a long-distance telephone call to the Washington D.C. home of ALPA President Woerth at 3:06 p.m.  Exh. P-40; <u>see</u> Tr. at 447 (Migliore); 83-84 (Attarian).  Attarian testified that all the members of the ALPA negotiating team were present in the room at the time of the call.  Jacobsen was not present.  Tr. at 74, 120-121 (Attarian).

Woerth recalled that the ALPA negotiators telephoned him on the evening of February 5, shortly after he arrived home.  He did not recall receiving any calls that morning from Attarian, or any calls later in the day while he was still at his office.  He could not recall the exact time of the call, but stated that he had just arrived home.  The call lasted between 15 and 30 minutes.  There were multiple parties on the line, on the speaker phone.  Woerth Depo. at 12, 46-47.

Woerth recalled discussing a settlement amount of $23.8 million, and the subject of re-employment rights in the event the airline started up again.  He said Haddock was particularly concerned about re-employment rights.  With regard to the monetary settlement, Woerth's concern was that the senior captains each get at least $100,000.  He didn't "approve" any particular settlement amount, but rather "considered the whole thing as an update."  Woerth Depo. at 13, 53-57.

Migliore told Woerth that he had received a document from EWA, but it was not clear to Woerth from whom the document had come.  According to Woerth, Migliore said he had just started to review it, and that there was "all kinds of stuff in here I don't understand why it's here."  Migliore hadn't yet reviewed the document thoroughly, but felt there were problems with

United States District Court
For the Northern District of California

EWA trying to get ALPA involved in "stuff that's outside our collective bargaining area." Woerth was concerned about anything that might put ALPA at risk. He recalled telling Migliore not to do anything to make matters worse for ALPA. "[M]y instructions to Marcus [Migliore] were absolutely make sure that the institution is protected, . . . and we don't make matters worse for ALPA by entertaining even in the remotest manner anything that doesn't pertain to this shutdown grievance." Woerth Depo. at 50-56.

According to Woerth, the ALPA negotiators told him they would give him an update later; no one told him during the call that the parties had reached agreement on anything. "We hadn't reached agreement on money. We hadn't reached agreement on entanglements of other litigation. We hadn't reached agreement on the terms of a startup airline or of all the open issues." Woerth Depo. at 53. Woerth concluded after the February 5 telephone call that the ALPA representatives were only going to try to button down a monetary amount of $25 million, and that "the rest wasn't even solvable" in San Francisco. Woerth Depo. at 68-69.

Attarian recalled that the call was placed to Woerth in his home in Washington, D.C. late in the afternoon, and that it lasted approximately 20-25 minutes.[7] The call originated from ALPA's hotel meeting room, and the ALPA representatives told Woerth (over the speaker-phone) that a $25 million figure had been discussed, plus waiver and start-up issues. Attarian told Woerth that amount would give the senior pilots approximately $100,000 in settlement, which Attarian felt represented "real money" or "true value" or "meaningful economic support for pilots" or "real money in the pilots' pockets." Attarian recalled that Woerth said "good job" about the $25 million figure. Woerth thought the $25 million figure "met the test" – i.e., was sufficient to meet the obligation to the pilots so there would be no future DFR litigation issues. Tr. 72-80 (Attarian). Attarian couldn't recall whether EWA had made any monetary offer as of the time of the phone call, just that the first monetary offer was made mid-afternoon. Tr. at 84-

---

[7] At the evidentiary hearing, Attarian stated that he had testified in his deposition that the ALPA representatives had made two calls to Woerth on February 5, 2003 – one in the morning, and a "more substantive" one late in the afternoon, at approximately 5:30 p.m. or 5:45 p.m. However, when presented at the hearing with the hotel's record of the telephone calls made from his hotel room, Attarian agreed that a call had been made to Woerth at 3:06 p.m. Tr. at 72, 81-84 (Attarian).

86 (Attarian).

Attarian recalled that Haddock explained to Woerth what would happen if EWA started up a new airline.  The team also discussed the final settlement documents provided by Jacobsen, and Woerth said he did not want ALPA exposed to lawsuits because of the waiver documents.  Woerth also said he wanted the issue involving the restart of the airline to be negotiated because he didn't want litigation over that issue.  Tr. at 73-78 (Attarian).

According to Attarian, Woerth did not approve the settlement of the shut-down grievance, did not approve the draft settlement documents, and did not approve the waiver/release in the draft settlement documents.  Attarian stated that one of many concerns was that EWA's proposed waiver/release would require any pilot to dismiss outside litigation before receiving settlement money.  Tr. at 122-124 (Attarian).

Haddock recalled that Attarian started the conversation, making some initial comments regarding other business.  He reviewed what had happened at the Dallas session in 2002, and told Woerth about EWA's current monetary offer.  According to Haddock, ALPA hadn't made a firm monetary proposal prior to the call to Woerth.  The figure the ALPA representatives discussed with Woerth was $23.8 million in "new money."  Haddock recalled that ALPA made that monetary proposal after the telephone call.  Haddock Depo. at 45-46, 115.

Haddock recalled that the ALPA representatives decided to stick with $23.8 million "new money" plus $1.2 million old (Harris award) as the bottom line.  He believed that Woerth was deferring to the judgment of the negotiating team as to what was attainable in terms of money.  Woerth said they should put it all together and he would look at it.  Haddock Depo. at 46-49.

Haddock recalled discussion of the start-up, which was a concern in the pilot group.  Haddock favored going into the next contract period – 2007 – and Granof or Migliore suggested that the agreement should include affiliates of CNF.  Haddock Depo. at 47-48.

According to Haddock, the remainder of the discussion related to potential DFR issues for ALPA regarding waivers of rights for pilots in connection with current or pending lawsuits

17

United States District Court
For the Northern District of California

1    and current grievances.  Haddock was less concerned about potential DFRs and more about

2    individuals in the pilot group being able to pursue their own paths outside the CBA, because

3    he knew there were several pending grievances.  Haddock Depo. at 49-51.

4         Haddock also recalled a lengthy discussion of the Burley issue – which he described

5    as "the union's ability to give up the rights of individuals to litigate against the company."

6    According to Haddock, Migliore stated that he was not prepared to tell the EWA

7    representatives that ALPA would make an agreement without review by his boss and also by

8    outside counsel.  Woerth responded, "Well, you [Attarian] and Gene [Granof] need to do it,"

9    adding that the attorneys – Migliore and Granof – needed to make sure there was no liability

10   for ALPA.  According to Haddock, Migliore said, after a brief review of the draft settlement

11   document, that there might be some Burley issues that ALPA might not be able to overcome,

12   and he wouldn't know until further legal review.  Woerth reiterated the importance of ensuring

13   that any final agreement not subject ALPA to a DFR suit or other litigation.  Haddock Depo. at

14   52, 57, 117-121.

15        Haddock said Migliore briefly discussed pending lawsuits.  Haddock Depo. at 53-55.

16   Haddock distinguished between "current" lawsuits and "pending" lawsuits, noting that there

17   were two "current" lawsuits – one called the "California lawsuit" (a whistleblower suit) and the

18   other a WARN Act suit in Ohio – and that there was also a "pending" lawsuit, which might be

19   filed any day – the Del Turco lawsuit.  Haddock Depo. at 117.

20        Haddock recalled Granoff stating that the timing of the arbitration was something that

21   ALPA should consider in trying to reach a settlement with EWA – that it was better to settle for

22   something reasonable today than litigate for something that might be increased down the

23   road.  However, Haddock didn't recall Granoff saying anything regarding waivers or review

24   discussed by Migliore.  Woerth complimented the team on their efforts, though Haddock didn't

25   recall compliments on results achieved thus far.  Haddock Depo. at 57-58.

26        Migliore testified that Woerth and the ALPA team discussed whether a $25 million total

27   settlement would be sufficient from the standpoint of defending against a DFR action.

28   Migliore told Woerth that he thought ALPA had a stronger case with regard to the permanent

18

United States District Court
For the Northern District of California

1  shutdown grievance than it had for the temporary shutdown grievance.  Tr. at 392-395

2  (Migliore).

3       Migliore also recalled that Woerth and the ALPA team discussed EWA's draft

4  settlement document.  Migliore told Woerth that Jacobsen had given them four or five single-

5  spaced, tightly packed pages of material that he (Migliore) had only had time to glance at

6  quickly, and that it was obvious that "there were going to have to be serious issues of review

7  necessary" with respect to the document, in particular by the chief counsel of ALPA, and by

8  outside counsel.  Migliore understood Woerth to be concerned that ALPA be protected from

9  pilots who might file suit against ALPA.  Woerth told the ALPA representatives he would leave

10 it to the lawyers to work out.  Tr. at 395-399 (Migliore).

11      Granof heard the conversation from both ends, along with Migliore, Haddock, and

12 Englert.[8]  He recalled that the focus of conversation was on money – that with the "new money"

13 plus the arbitration award, the total monetary settlement would be $25 million.

14      Either Englert or Attarian stated that the settlement would put as much as $100,000 in

15 the pockets of the individual pilots – perhaps more in cases of senior pilots – and even to the

16 less senior pilots the amount could be $80,000 or $90,000.  Granof recalled some discussion

17 about the possibility of EWA restarting the airline, and an agreement that if airline was

18 restarted in 2004, the CBA would be reinstated.  He recalled a suggestion from someone that

19 the date be extended to 2007.  Granof Depo. at 106-109.

20      Granof also recalled that Migliore explained to Woerth that the waiver issue had not all

21 been settled, and that it was an issue that probably had to be worked out, primarily between

22 the lawyers, if there was going to be a settlement.  Granof stated that Migliore did not minimize

23 the issue, and that Woerth's response was, "Okay, but be sure that whatever you do that ALPA

24

25      [8] Granof recalled that the phone call to Woerth occurred a short time after Jacobsen
26 conveyed EWA's acceptance of ALPA's monetary demand.  Granof Depo. at 106.  According
   to McCurdy's notes and the testimony of the participants, EWA agreed to the $23.8 million
27 settlement amount at approximately 5:30 p.m.  As Woerth stated he received only one phone call
   on February 5 from the ALPA negotiators, Woerth Depo. at 46-47, 56-57, and no other witness
28 testified to there having been more than one phone call to Woerth, the court concludes that Granof
   was mistaken in his recollection of the timing of the call.

19

is protected." Granof didn't think the actual settlement document was discussed, and was not certain whether Migliore mentioned they had received such a document. He stated, however, that there was no discussion of its specific terms or provisions. Granof Depo. at 108-109.

Englert was present during the call to Woerth, although he was occupied with the computer. According to Englert, Woerth said, "Do the best you can and keep us legal." Englert recalled a discussion about what would happen were an airline to be restarted, and also recalled a reference to review by outside counsel, in connection with the document Jacobsen had brought in. Englert Depo. at 30-34, 53-54.

ALPA's "Counterproposal"

Kline testified that at around 3:30 p.m., he received a "counterproposal" from Migliore to the "final settlement agreement" (referring to he draft settlement document that EWA had previously provided to ALPA). He stated that he and Fausset met with Migliore at Jacobsen's request, and that Migliore proposed a change in the draft settlement proposal. According to Kline, Migliore sought to change the provision, "Should EWA or CNF establish another Part 121 air carrier prior to September 18, 2004, such carrier shall offer employment as pilots to [individuals on EWA Pilot Seniority List]," to read, "Should EWA, CNF, or any subsidiary thereof establish another Part 121 air carrier prior to September 18, 2007, such carrier shall offer employment as pilots to [individuals on EWA Pilot Seniority List]." Tr. at 183-184 (Kline).

Kline claimed that Migliore stated that this provision came directly from Woerth, was "virtually nonnegotiable," and was very important to Woerth, and that if EWA didn't agree to make those changes, it didn't matter what the money was. According to Kline, Fausset subsequently received approval for that proposal from Schmoller, CNF's general counsel. Kline then called Migliore in the ALPA suite and told him they agreed. Tr. at 184-188 (Kline).

Migliore disputed Kline's account, asserting that this meeting never took place. He testified that the ALPA representatives at some point gave the EWA representatives "a heads-up that this [issue] was a concern," through Jacobsen, and claimed that the agreement regarding re-employment rights "was essentially tied down" at the 2-on-2 meeting that occurred some time after 5:45 p.m. (discussed below). Tr. at 414-416 (Migliore).

20

United States District Court

For the Northern District of California

ALPA's Monetary Proposal and EWA's Response

EWA's next meeting with Jacobsen was at 3:45 p.m.  According to McCurdy's notes, Jacobsen conveyed ALPA's monetary demand – a total of $25 million, or $23.8 million in "new money," plus the $1.2 million Harris award.  Jacobsen noted that this amount was a little above $55 thousand per employee, adding, "This is after going to the mountain.  That will button it up."  Exh. D-1 at 11-0247.

Both Fausset and Kline recalled this meeting, in which Jacobsen conveyed ALPA's offer to settle for $23.8 million in "new money."  Fausset Depo. at 118; Tr. at 192, 218-219 (Kline).  The entire EWA bargaining team was present.  Tr. at 192 (Kline).  In Kline's view, Jacobsen's statement, "This is after going to the mountain," could be interpreted only as meaning that the ALPA team had obtained the number from Woerth.  Up to that point, according to Kline, EWA had never officially offered as much as $23.8 million in settlement of the parties' disputes.  Kline added, however, there had been an off-the-record proposal in the Dallas mediation, to settle everything for $25 million.  Tr. at 219-220 (Kline).

According to McCurdy's notes, Jacobsen left the EWA meeting room at 3:49 p.m., and was called back in by Fausset at 4:03 p.m.  Exh. D-1 at 11-0247.  Jacobsen then met with the EWA representatives from 4:03 p.m. to 4:09 p.m.  During this meeting, Fausset authorized Jacobsen to convey an offer to ALPA of $20.8 million in "new money" plus the $1.2 million arbitration award.  Exh. D-1 at 11-0247 to 11-0248.  Jacobsen left the EWA room at 4:09 p.m.  When she returned at 4:21 p.m., she asked Fausset to join her in the "woodshed."  Exh. D-1 at 11-0248; Fausset Depo. at 119.

"Woodshed" Meeting

According to McCurdy's notes, the "woodshed" meeting occurred between 4:21 p.m., when Jacobsen and Fausset left the EWA meeting room, and 4:28 p.m., when they returned.  Exh. D-1 at 11-0248.  Fausset first described the "woodshed" as a little conference room 25-30 feet on the left side of the corridor where Attarian and Fausset had met Jacobsen twice.  Fausset then stated that there were actually three different "woodshed" meetings.  The first such meeting occurred after lunch, in the hallway down from the little conference room.  The

United States District Court

For the Northern District of California

1    subject was "issues of money and the rest of the deal."  Fausset Depo. at 119-124.

2          In the second meeting – the one occurring between 4:21 p.m. and 4:28 p.m. – Fausset,

3    Attarian, and Haddock met with Jacobsen.  Fausset offered to "split the baby" – split the

4    difference between the $23.8 million and the $20.8 million – but Attarian said, "No."  The third

5    meeting was "when we shook hands and agreed on the 23.8."  Fausset Depo. at 120-127.

6          Attarian recalled that the "woodshed" meeting with Haddock, Fausset, and Jacobsen

7    was short, maybe 5 minutes, and occurred after ALPA made the $23.8 million counteroffer

8    and before EWA agreed to the $23.8 million.  Attarian also stated that Fausset had tried to

9    "split the baby" but that he (Attarian) would not agree.  According to Attarian, no one discussed

10   the draft settlement document or the waiver/release at this meeting.  Attarian stated that he

11   had no further meetings with Fausset or other EWA representatives.  Tr. at 126-128 (Attarian).

12                    Subsequent Proposals and Agreement on Monetary Figure

13         McCurdy's notes reflect that at 4:28 p.m., Jacobsen and Fausset returned to the EWA

14   room, where Jacobsen remained until 4:40 p.m.  According to McCurdy's notes, Fausset next

15   offered $22.8 million (in "new money"), and Jacobsen left the room at 4:40.  See Exh. D-1 at

16   11-0248; Fausset Depo. at 127.

17         Attarian testified that he returned to the ALPA room following the "woodshed" meeting.

18   He recalled  receiving a telephone call from Jacobsen a few minutes later, asking what he

19   would say to $22 million (in "new money").  Attarian's response was "Tell them 'bye.'"  Attarian

20   recalled that the ALPA representatives received another call perhaps five minutes later,

21   saying that EWA had met ALPA's new money demand.  Tr. at 129 (Attarian).

22         McCurdy's notes and the testimony of other witnesses report a slightly different

23   sequence.  McCurdy's notes show that from 4:40 p.m. to 4:42 p.m., Jacobsen met with the

24   ALPA representatives, and at 4:42 p.m. returned to the EWA representatives' room.  Exh. D-1

25   at 11-0248.  According to Fausset, Jacobsen reported that ALPA was holding firm at $23.8

26   million.  Fausset Depo. at 127-128.  Jacobsen then left the room at Fausset's request, Exh. D-

27   1 at 11-0248; and the EWA representatives (Fausset, Kline, Mccurdy, Kierce, and Marshall)

28   had a caucus.  Fausset stated that he was "in a tirade," and was "pissed," but that he reviewed

                                                22

United States District Court

For the Northern District of California

1    the future and pending litigation expenses, and decided the $23.8 million was a good trade-off

2    for settling everything.  He called Schmoller, who agreed.  Fausset Depo. at 127-135.

3        Schmoller denied that Fausset had called to ask for approval – he claimed, rather,  that

4    Fausset had called simply to run the $23.8 million figure by him.  Schmoller stated that he and

5    Fausset had a "long-standing relationship," adding that "I'm kind of his mentor . . . the guy that

6    brought him into the company, into the headquarters part of it."  Schmoller Depo. at 11-12.  He

7    said that Fausset called to tell him the parties could have an agreement if EWA went to $23.8

8    million.  Schmoller asked whether "the other stuff" was settled, and Fausset said it was.

9    Schmoller then said that Fausset should "do it."  Schmoller Depo. at 40-41.

10       McCurdy's notes reflect that Jacobsen returned to the EWA room at 5:15 p.m., and met

11   with EWA representatives until 5:35 p.m.  During that meeting, Fausett told Jacobsen, "We

12   agree to settle for $23.8 million.  We insist that anyone who participates signs a full release.  I

13   think the attorneys can take over now."  At that point Jacobsen said, "They will want to talk to

14   [Woerth] about it, I am sure.  The attorneys can take it from here.  I will let them know.  I have

15   Jeff [Haddock] and Howard [Attarian] come down."  Exh. D-1 at 11-0248 to 11-0249.

16       Migliore believed it was Jacobsen who informed the ALPA representatives that EWA

17   had come up to the $23.8 million figure, but couldn't recall whether she telephoned them or

18   came up to the ALPA meeting room.  He did not recall her saying that EWA's acceptance of

19   the $23.8 million figure was contingent on ALPA accepting EWA's draft settlement document

20   without any changes.  Tr. at 399-400 (Migliore).

21       Attarian recalled that when Jacobsen called ALPA to say that EWA had accepted the

22   $23.8 million counteroffer, she stated that the parties would have to engage in further

23   negotiations regarding the other details.  Attarian said that Jacobsen also came up to the

24   ALPA room to deliver the news in person.  He claimed that Jacobsen did not tell the ALPA

25   representatives that EWA's acceptance of that figure was conditioned on the waiver; rather,

26   she said that the lawyers were going to work out the details.  Attarian assumed that these

27   "details" were "the details of the rough document that contained the waiver release."  He

28   thought it was understood that this was "a piece of the business that was unfinished and an

23

issue that was unfinished."  Attarian believed that Jacobsen knew ALPA had to get approval

of ALPA's president.  According to Attarian, "one piece of the settlement was reaching the

monetary figure, which we had taken a long time to get to, and now the other issues certainly

had to be, you know, resolved."  Tr. at 99-100, 128-134 (Attarian).

    Attarian testified that in the last conversation of the day between Jacobsen and the

ALPA representatives, Jacobsen did not say that EWA believed or that she herself believed

that ALPA had already agreed to EWA's draft settlement document or the specific terms of

the settlement and release.  Nor did she say that the company's offer of $23.8 million in "new

money" was conditioned on ALPA's accepting the draft settlement document with no changes

or on ALPA's accepting the specific terms of the waiver and release.  Attarian did not tell

Jacobsen that ALPA was agreeing to the draft settlement document or to the waiver and

release contained in the document.  Tr. at 132-135 (Attarian).

    Granof believed that Jacobsen advised ALPA that EWA had accepted ALPA's $23.8

million "new money" demand, but couldn't recall whether it was in person or on the phone.  He

did not recall Jacobsen saying there were any conditions on EWA's acceptance of the $23.8

million.  He didn't recall exactly what everyone said after she told them the demand had been

accepted.  He believed that Attarian, Migliore, Haddock, and Englert were also present in the

room at the time.  Granof Depo. at 96-99.

    Haddock testified that Jacobsen told the ALPA negotiators late in the afternoon that the

$23.8 million figure was acceptable.  He stated that Jacobsen did not reference the draft

settlement document when she announced the agreement to the money demand.  Haddock

Depo. at 99, 110-111.

    Englert testified that Jacobsen came into the room and said, "They have met your

$23.8 million.  They've met your number."  According to Englert, Jacobsen did not say

"agreement."  He also recalled Jacobsen asking that there be confirmation between the two

parties that they had come to a meeting of the minds on the number.  He recalled that

Haddock and Migliore went down to confirm with EWA/EWW.  Englert Depo. at 17-18

    After Fausset agreed to ALPA's demand for $23.8 million, and Jacobsen said that "the

24

United States District Court
For the Northern District of California

1    attorneys can take it from here," Grant did not consider the issue of whether there would be a

2    settlement agreement and releases in the form Kline had prepared to still be an open

3    question.  He understood there would be some things the lawyers would work on, but when he

4    heard Jacobsen say there was a deal, he understood that "all conditions precedent to the

5    formation of the agreement had been reached."  Grant Depo. at 79-87.

6            Grant testified that when Jacobsen came back to EWA after conveying EWA's

7    acceptance of the $23.8 million monetary figure to ALPA, she said there was a deal, and that

8    "based on the course of conduct," he understood that the "deal" included "the material terms of

9    the documents."  Grant agreed, however, that after EWA had given Jacobsen the settlement

10   document to give to ALPA, nearly all of the following discussions concerned the dollar figure to

11   be arrived at between the parties.  Grant Depo. at 119-120, 129-130.

12           Kline stated that the entire EWA bargaining team was present in the late afternoon

13   when Jacobsen conveyed ALPA's proposal of $23.8 million to EWA, and when Fausset

14   agreed to the $23.8 million figure.  According to Kline, at the time Fausset gave Jacobsen the

15   authorization to accept the $23.8 million offer, Fausset told her it was the money plus the

16   settlement/release document – that they went together.  Kline stated that previously in

17   Jacobsen's discussions with EWA, Fausset had linked the money proposal and the

18   acceptance of the release and settlement document.  Tr. at 192-193, 295 (Kline).

19           Kline testified that Jacobsen then left the EWA room, went back upstairs to ALPA's

20   suite to communicate EWA's acceptance of the money, returned with Attarian, came back into

21   the EWA room and said either, "You have a deal," or "We have reached an agreement," or

22   "We have an agreement," and asked Fausset to accompany her outside the room.  Kline saw

23   Fausset leave with Jacobsen, and stated that he next saw Fausset and Jacobsen a few

24   minutes later.  Tr. at 194-195; 294-296 (Kline).

25           The ALPA bargaining team then came downstairs to meet with the EWA team.  This

26   was about 5:45 p.m.  Kline recalled seeing Haddock, Attarian, Migliore, and Englert.  He

27   couldn't recall whether Granof came down for that meeting or not, but stated that Jacobsen

28   was present briefly.  According to Kline, it was "quite exuberant in the room, people shaking

United States District Court

For the Northern District of California

1   hands, going around the room."  Kline stopped and talked a little bit with Attarian, saying

2   something to the effect of, "Congratulations.  You know, we did it again.  We reached another

3   agreement."  Attarian responded with similar words, adding that "it turned out not to be a fool's

4   errand after all."  Kline shook Attarian's hand, and also recalled shaking hands with Haddock

5   and Migliore.  Tr. at 195-197 (Kline).  Kline also stated that Fausset and Attarian shook hands

6   on the "agreement."  Tr. at 295 (Kline).

7        Grant recalled Jacobsen asking Fausset to go out and shake hands.  Although Grant

8   believed "there had been a handshake," he himself did not witness a handshake.  He stated

9   that Jacobsen left quickly because she had to catch a plane.  He also stated that Jacobsen

10  never said that the attorneys had looked at the agreement and that ALPA had agreed to all

11  terms.  Grant Depo. at 60-69.

12       Haddock recalled shaking hands with Fausett at the end of the day and saying,

13  "Hopefully, we can put something together."  According to Haddock, Fausset did not say

14  anything to Haddock to indicate he believed the parties had a settlement.  Haddock Depo. at

15  106-08.

16       Granof was not aware of Fausset and Attarian accompanying Jacobsen to a place

17  away from the ALPA meeting room after she had announced EWA's acceptance of the money

18  demand.  Nor was he aware of Fausset and Attarian exchanging any further terms of

19  settlement between them after the agreement was reached on the money demand.  Granof did

20  not recall Jacobsen inviting all the participants into the room to shake hands with one another

21  after the agreement was reached on the money, and did not himself recall shaking hands with

22  any of the negotiators at the conclusion of the mediation.  Granof Depo. at 104-105.

23       When she was deposed in September 2004, Jacobsen was able to recall only a few

24  details of the February 2003 mediation because her memory had been affected by the course

25  of chemotherapy she had undergone in 2004.  She did not recall bringing Fausset and

26  Attarian together late in the day, and didn't recall any handshake.  She stated, however, that

27  she did have a practice of bringing the parties together to congratulate one another at the

28  conclusion of a successful mediation.  As best she could recall, she had left the mediation on

February 5 believing that there was an agreement that was contingent on a release from the pilots.  Jacobsen Depo. at 46-48, 65-66, 78.

Jacobsen recalled that there was an agreement on the money and that the ultimate agreement was contingent on the releases being resolved or acquired or achieved or worked out.  Jacobsen Depo. at 66, 69, 81-82.  When she used the terms "achieved" or "acquired" or "worked out" in reference to the releases, Jacobsen meant that the contingency involved ALPA and EWA negotiating and reaching agreement on the terms of a release and waiver. Jacobsen Depo. at 85.  She added, however, "[I]f they're still working something out, that's not a final agreement."  Jacobsen Depo. at 96-97.  Jacobsen recalled that obtaining the releases was important to the company, in order to justify paying out the $23.8 million.  Jacobsen Depo. at 71, 87.

Jacobsen also recalled receiving a settlement proposal from EWA at the mediation, which she passed on to ALPA.  She did not read the EWA proposal, but rather simply presented it to the ALPA representatives, and told them that the money was contingent upon the parties being able to work out or negotiate a resolution to the release.  She was not specific about the kind of release, and believed the parties were going to be meeting after she left the mediation to continue discussions on the subject of the release.  Jacobsen Depo. at 72-76, 91.  She didn't recall ever saying that the agreement was contingent on ALPA's acceptance of the precise language regarding the releases that appeared in EWA settlement document.  Jacobsen Depo. at 88-89.

Attarian testified that Jacobsen never stated that ALPA and EWA had reached an "agreement."  Tr. at 140 (Attarian).

Woerth stated that he would be surprised if Jacobsen had said that EWA and ALPA reached agreement on all issues in the mediation.  Moreover, no one has ever told him that. Woerth Depo. at 63.  Woerth testified that as president of ALPA, he never approved a settlement of the shutdown grievance with Emery Air Freight.  Woerth Depo. at 69-70.

The "2-on-2" Meeting

Migliore believed that shortly after communicating EWA's acceptance of the $23.8

27

United States District Court

For the Northern District of California

1   million figure, Jacobsen suggested to Attarian that there be a follow-up meeting between

2   ALPA and EWA.[9]  Migliore believed the purpose of the meeting was to "touch base" – to

3   confirm that both sides had told each other face-to-face that $23.8 million was the monetary

4   figure.  Tr. at 400-401 (Migliore).

5          Granof recalled that after the call to Woerth, Migliore and Haddock went down to meet

6   with some of the EWA representatives, and that by the time they came back, there wasn't

7   much of the day left before dinner.  Granof Depo. at 110.  Granof didn't ask to be included in

8   the 2-on-2 meeting, wasn't asked to attend, and was "more than happy not to."  There wasn't

9   any reason for him to be there.  He thought it was perfectly appropriate for Migliore and

10  Haddock to be the two people who went down there.  Granof Depo. at 117-119.

11         The participants in the 2-on-2 meeting were Kline (for EWA), Grant (for EWW), and

12  Migliore and Haddock (for ALPA).  Tr. at 139 (Attarian); Tr. at 199-200 (Kline); Haddock

13  Depo. at 78.  Migliore stated that Attarian made the decision that Migliore and Haddock

14  should go down to meet with the EWA representatives.  Tr. at 401 (Migliore).

15         Attarian testified that after the parties reached agreement on the numbers, two

16  members of the ALPA group (not including Attarian) went down to discuss the remaining

17  terms with EWA.  Two remaining items for discussion were re-employment rights in the event

18  of a start-up, and the waiver.  Attarian stated that Migliore made it clear that both inside and

19  outside counsel would look at the waiver language before any signoff.  Tr. at 135-139

20  (Attarian).

21         Migliore testified that before he went down for the meeting, Attarian asked him what he

22  was planning to say.  He told Attarian that he would tell the other participants that "we're there,

23  in terms of the number" – $23.8 million – but that in terms of the four- or five-page draft

24  settlement document, any settlement proposal would have to be reviewed and approved by

25  the general counsel of ALPA legal department, the director of the ALPA legal department, and

26  _____

27         [9]   Jacobsen did not recall knowing that there was going to be a "2-on-2" meeting.  She
       recalled simply that there was going to be a further meeting after she left the mediation session.
28  Jacobsen Depo. at 93

28

1    outside counsel.  Migliore and Haddock also planned to confirm the re-start date going from

2    2004 to 2007.  Tr. at 401-402 (Migliore).

3         Once at the meeting, Migliore did say something to the effect of "We're there on $23.8

4    million."  He then stated that he did not have the authority to sign or approve the draft EWA

5    settlement document, and reiterated that it required approval by other people, including his

6    boss.  Migliore recalled Kline saying something to the effect of, "It's rough.  I understand it's

7    rough."  Migliore claimed that Kline never said, "We already have an agreement" or "You've

8    already accepted it."  Kline later told Migliore that he would be sending him another draft of the

9    settlement document after Migliore had returned to Washington, D.C., and Migliore testified

10   that Kline did in fact send one on February 14, 2003.  Tr. at 404-408 (Migliore).

11        Migliore then spent some time reiterating ALPA's concerns – specifically, that a

12   number of pilots had sent ALPA letters saying, "Don't settle, or else."  He told Grant and Kline

13   that he believed ALPA would probably be sued.  Tr. at 406-407 (Migliore).  Migliore also

14   recalled some discussion about the types of claims that would be included in the waiver and

15   release.  He stated that ALPA and EWA never agreed that if the waiver and release that EWA

16   wanted was legal, then they had a deal.  Migliore recalled that Haddock indicated that there

17   might be pending grievances that had nothing to do with the shutdown, and shouldn't be

18   included in any waiver and release.  Migliore felt that Kline wanted "as much wrapped in as

19   possible," and that the issue of what was included was not resolved at the 2-on-2 meeting, and

20   remained open to be negotiated.  Tr. at 409-413 (Migliore).

21        Migliore recalled that Haddock raised the subject of the startup issue – that is, what

22   would happen if a CNF-affiliated company started another airline in the future.  Migliore

23   believed that ALPA had communicated this issue to Jacobsen, and that she had

24   communicated ALPA's concerns to EWA.  Migliore testified that Kline agreed during the

25   2-on-2 meeting that the companies would move the date from 2004 to 2007, and would

26   include any air carrier affiliated with CNF.  Tr. at 414-424 (Migliore).

27        According to Haddock, the 2-on-2 meeting occurred around 5:30 or 6:00 p.m.

28   Haddock Depo. at 74.  Haddock didn't know who arranged the meeting.  He knew that

United States District Court

For the Northern District of California

1  Jacobsen said that Fausset wanted the ALPA representatives to come down and talk with

2  Kline.  Haddock Depo. at 90.  According to Haddock, Attarian felt that it would be best if he

3  himself did not participate in the 2-on-2 meeting, and suggested that Haddock and Migliore

4  go instead.  Haddock Depo. at 119, 126-127.

5      Haddock's understanding just prior to the 2-on-2 meeting was that the parties had

6  reached an agreement on the money, and that they could then start working toward a final

7  agreement.  He thought that EWA was going to pay the $23.8 million to resolve the shut-down

8  grievance and the remainder of the term of the CBA.  He did not understand before he went to

9  the meeting that EWA intended that the payment of the $23.8 million would be conditioned on

10  waivers of grievances and civil actions.  Haddock Depo. at 104, 124-125.

11      Haddock testified that Migliore started the conversation with Kline and said that the

12  $23.8 million figure was agreeable to ALPA, and then immediately discussed instructions

13  from Woerth regarding liability.  According to Haddock, Migliore specifically referred to Kline's

14  draft and said it would have to be re-written somehow.  Migliore said he would take it to his

15  boss, Jonathan Cohen, and outside counsel, and would review it as soon as he got back to

16  D.C.  Haddock Depo. at 52, 57, 119-121.

17      Haddock recalled discussions in the meeting regarding DFR and other lawsuits.  He

18  stated that  Migliore was "fairly animated" regarding directions from Woerth with regard to the

19  DFR issue, and that ALPA had to make sure that the contract they had was reviewed by his

20  (Migliore's) boss and by outside counsel to ensure that ALPA was not left open to litigation.

21  Haddock Depo. at 82-83, 118-119.  Haddock recalled Migliore saying, "We have other

22  lawsuits."  Kline responded, "Well, they all have to go away."  At that point Haddock thought it

23  "was actually going to come unraveled."  That was when he wrote in his notes, "This may not

24  work."  He said he had a "sinking feeling."  Haddock Depo. at 83.

25      On the conversation regarding pending individual grievances, Haddock recalled Kline

26  saying, "We're not going anywhere unless those go away."  Haddock said he responded,

27  "That isn't my understanding."  Haddock wanted to make the point that the grievances had to

28  be treated separately, and he said as much to Kline.  Kline responded, "No, they're going

30

United States District Court

For the Northern District of California

1  away." Haddock was "a little bit taken aback." That's when he wrote, "This may not be

2  possible." Haddock Depo. at 84-86, 117-118, 124.

3      Haddock did not recall any discussion of holding back part of the $23.8 million to cover

4  individual grievances. He believed ALPA had discretion to do that, however. Haddock Depo.

5  at 86-87, 119, 123. Haddock recalled Grant making the comment that he believed all the

6  lawsuits and the grievance would have to go away. Haddock Depo. at 88.

7      Haddock stated that at the end of the meeting, Migliore reiterated that his assignment

8  would be to take the settlement agreement back to ALPA counsel, general counsel, and his

9  boss. They would then have a review from the outside, and only then would it go to Woerth for

10  approval. Haddock Depo. at 88. According to Haddock, it was not a final agreement. He

11  described the "agreement" as a "TA" or – a "temporary agreement" in the collective

12  bargaining process. He also believed that any settlement of individual grievances would be

13  over and above the $23.8 million. Haddock Depo. at 122-125.

14      At the conclusion of the 2-on-2 meeting, Haddock shook hands with Kline and Grant.

15  Haddock may also have shaken hands with Fausset out in the hall after the 2-on-2. He

16  recalled Fausset saying something along the lines of, "I'm glad you could make it out here so

17  we could work on this." Haddock responded, "Hopefully we can, you know, put something

18  together." Fausset then asked Haddock about his current employment with Federal Express,

19  and Haddock responded that it was "fine" and was "working out." They then shook hands and

20  said, "Good-bye." According to Haddock, Fausset did not say anything to indicate he

21  believed the parties had reached an agreement on all the issues under discussion during the

22  mediation session. Haddock Depo. at 106-107.

23      Englert testified that at the conclusion of the 2-on-2 meeting, Migliore and Haddock

24  came back into the ALPA room and confirmed that they had given the EWA representatives

25  the message they had discussed earlier. They also stated that there had been a meeting of

26  the minds on the $23.8 million in "new money," and that legal counsel for both sides "were

27  going to have to reach an agreement on some language because they had not done that at

28  that point in time." Englert Depo. at 18-19, 50-51.

United States District Court

For the Northern District of California

When Migliore referred to the "agreement on language," Englert understood him to be referring to the document Kline had given to Jacobsen to give to Migliore and Granof, which document contained the settlement terms that the parties had not yet agreed to. Englert believed this was the document Jacobsen brought in and handed to either Granoff or Migliore. Englert stated that Migliore said he told Kline and Grant that it would have be reviewed by ALPA in-house and outside counsel and they were going to get a "clean draft of stuff to work on" during the week. Englert also stated they had not come to an agreement. Englert Depo. at 51-53.

Kline testified that Jacobsen arranged the 2-on-2 meeting, that she called some time after 4:00 p.m., and asked whether EWA would be amenable to changes and suggestions that Migliore had in the waiver and release. He said she characterized these changes as "strengthening" the release. Tr. at 198-199 (Kline).

According to Kline, the mood of the attendees in the 2-on-2 meeting was similar to that in the "general meeting" that followed the parties' agreement on the settlement figure. He says "The mood was exuberant among the four of us in the room. We were very happy." The meeting was short, lasting about 10 minutes. Tr. at 199-200, 222-223 (Kline).

Kline stated that Haddock made several points during the meeting. One had to do with whether there were any individual grievances still pending other than the shutdown grievance. Kline told Haddock he did not think there were any pending grievances, but said he would check further. Kline stated that Haddock "asked a variety of questions in order to implement the settlement that had been reached earlier in the day." Haddock wanted a list of pilots from EWA, information about any pending individual grievances, information about any pilots that were about to turn 60, information about any pilots that were on long-term disability. Tr. at 232-238 (Kline).

Kline testified that Migliore proposed changes to the provisions regarding waiver and release – that he proposed adding specific references to the statutory exceptions, the Railway Labor Act, and the WARN Act. Kline stated that Migliore explained that he wanted the RLA referenced because it provides the basis for DFR lawsuits for airline and railway employees.

United States District Court

For the Northern District of California

1   Kline claimed that Migliore wanted the reference to the WARN Act because there was already

2   an existing WARN Act case, so that pilots would be releasing any claims against EWA for

3   violations of the WARN Act.  However, Kline also testified that the subject of the wording of the

4   release "never came up" at the 2-on-2 meeting.  He stated, "They were never asked if they

5   agreed or not."  Tr. at 317-318 (Kline).

6          Kline testified that he also spoke to Migliore about the possibility of EWA and ALPA

7   issuing a joint press release to announce the settlement.  He says Migliore asked that Kline

8   not do that, because ALPA wanted to release the information to its members itself.  Tr. at 239-

9   240 (Kline).

10          Kline stated in addition that he, Migliore, and Haddock also discussed how the

11   settlement funds would be disbursed, and who would communicate the settlement package to

12   the pilots – whether it would come from ALPA or whether EWA would mail out the documents.

13   He claimed they did not reach resolution on that issue.  He also recalled discussion about who

14   would communicate with the counsel representing the plaintiffs in the WARN Act case and in

15   the California action.  Migliore was reluctant to do that, so Kline offered.  According to Kline,

16   there were "a lot of . . . mechanics that still needed to be worked out."  Tr. at 240-242 (Kline).

17          On other points, Kline's recollections differed sharply from those of the ALPA

18   participants.  For example, Kline claimed that Migliore did not say anything in the 2-on-2

19   meeting to the effect that any agreement would have to be taken back to Woerth for review

20   and signature, and did not say that the draft settlement agreement waiver and release would

21   have to be reviewed by lawyers representing ALPA before there could be an agreement.  Tr.

22   at 231-232 (Kline).  Kline also testified that no one at the meeting ever said there could be a

23   problem with a release and waiver that covered outside lawsuits.  Tr. at 319 (Kline).

24          Kline agreed, however, that no one signed any settlement agreement or settlement

25   document at the conclusion of the mediation.  He also stated that in every grievance he has

26   ever settled in person, the parties have signed an agreement of some kind before leaving the

27   premises.  Tr. at 292-293 (Kline).

28          Grant recalled attending the 2-on-2 meeting late in the afternoon.  He stated that he

United States District Court

For the Northern District of California

represented EWW, and that Kline represented EWA.  Grant was aware of the whistle-blower

suit and WARN Act suit, and was aware that Rachford was attempting something with regard

to potential litigation.  Grant Depo. at 44-47.  Grant stated that the purpose of the 2-on-2

meeting was to make the agreement "as bullet-proof as possible," to make it "as complete as

possible."  He believed there would be changes to the draft settlement documents, but didn't

believe the draft was being renegotiated or that the "contours of the deal" were being

renegotiated.  Grant Depo. at 71-74.

Grant didn't recall Migliore saying that at the 2-on-2 meeting that the ALPA

representatives had not had time to review the draft settlement documents.  He didn't recall

any discussion about the president of ALPA, including whether he had approved the

agreement.  Grant Depo. at 113.

Grant recalled Fausset saying that there needed to be some "tweaking" between the

parties.  However, according to Grant, this was "tweaking" – not "negotiating."  He regarded

what they were doing as "technical work to finalize the document and finalize . . . the deal that

had been struck."  He stated that the matter wasn't stated in terms of "final" or "draft" – it was a

"course of conduct . . . and there were matters discussed at that meeting that had to do with

what I regarded as the strengthening of the doc."  Grant Depo. at 74-78.

Grant agreed that the draft settlement document states that it is subject to the final

approval of the president of ALPA and the CEO of EWA.  Grant Depo. at 78.  However, Grant

agreed with Kline that Migliore did not say he didn't have the authority to say there was an

overall deal until the terms had been subjected to further legal review, including review by the

head of ALPA's in-house legal department and by outside legal counsel.  Grant also said he

didn't recall Migliore saying, in reference to the draft settlement document, that he (Migliore)

did not know what sort of waiver was possible under the circumstances.  Nor did he recall

Migliore saying that the limits of what ALPA could agree to had to be "vetted" by ALPA's

attorneys.  Grant Depo. at 88-90.

Grant recalled some discussion of various other lawsuits, but did not recall that there

was any detailed discussion.  Nor did he recall Haddock discussing the pending lawsuits.

34

United States District Court

For the Northern District of California

1   What he did recall was a discussion of the $23.8 million monetary figure, and ALPA's

2   allocation of that money.  He also recalled Haddock asking about the pendency of the

3   individual grievances, but didn't recall any discussion about the substance of those individual

4   grievances.  Grant Depo. at 90-93.

5        Grant recalled some discussion of the DFR issue and whether that should be

6   specifically mentioned in the context of the waiver.  What he recalled about DFR was making

7   sure that the document was as bulletproof as possible with respect to that issue.  Grant Depo.

8   at 93, 101-102.  He didn't recall Haddock saying they could not resolve "all outstanding

9   matters" because there were pending individual grievances unrelated to the shutdown.  Grant

10  Depo. at 93-95.

11       Grant also recalled a discussion regarding the need for the release to provide the most

12  complete protection possible for both ALPA and EWA.  He stated that Migliore described the

13  Burley issue as "opt in/opt out" issue, and indicated that they were trying to determine the best

14  way within the context of the release to deal with the Burley issue.  Grant Depo. at 95-97, 111-

15  112.  Grant was aware that the pilots were being asked to sign a release giving up all claims,

16  and that they wouldn't get any money if they didn't give up even the non-CBA claims, and that

17  they wouldn't be able to pursue any individual grievances.  Grant Depo. at 70-71.  He recalled

18  Fausset saying that Kline could work with Granof and Migliore on the settlement release, but

19  didn't specifically recall Fausset saying that Kline and the ALPA attorneys could work on the

20  settlement agreement language.  Nor did he recall Jacobsen saying (before she left for the

21  day) that ALPA's attorneys would want to look at the settlement agreement language, or that

22  ALPA would have to talk to Woerth about it.  Grant Depo. at 56-64.

23       Grant agreed that as of the 2-on-2 meeting, there was going to be more work done on

24  the agreement, and there were going to be "follow-up drafts" submitted.  His understanding

25  was that what they were doing was "to make an agreement that was the term of a deal in

26  which both parties had – you know, there had been offer, acceptance, all that jazz, and a

27  contract."  He added, "What we were doing was essentially, you know, doing technical work on

28  the document, not renegotiating the terms of the deal."  He stated that he didn't recall Migliore

saying that he would have either in-house or outside counsel look at any follow-up draft.  Grant Depo. at 99-101.

Grant's understanding by the end of the day was that the offer conveyed by Fausset to Jacobsen was for $23.8 million plus the provisions in the settlement documents.  He believed that "a deal" had been reached that included these two documents, and that the participants had gone to the 2-on-2 meeting with this deal.  He considered the discussion in the 2-on-2 to have been "tweaking" – not "negotiating."  Grant Depo. at 54-55, 65-69, 82-87.

Grant added, however, that his understanding that there was "a deal" did not come from anything Jacobsen had said.  He stated that Jacobsen had simply come back into the EWA meeting room, and said there was a deal.  Grant never heard directly from ALPA that ALPA had accepted the terms of the written document, nor did he overhear anything to that effect from anyone at ALPA.  He recalled Jacobsen saying that both parties were at the same figure – $23.8 million.  Grant Depo. at 56-61.

**EVENTS FOLLOWING THE MEDIATION**

Attarian returned to Washington D.C. the week after the mediation.  Upon his return, he gave Woerth a recap, advising him that the parties had reached agreement on the monetary figure, that the startup issue was resolved, and that Migliore was working on the waiver issue.  Attarian testified that it was clear that the waiver was an open issue.  He testified that Woerth never signed any agreement, and never agreed to anything.  Tr. at 140-144 (Attarian).

Woerth confirmed that after the mediation session, Attarian told him that there was still more talking to do, that the discussions had not concluded.  He said Attarian had indicated that the last time the parties had talked on February 5, they were still negotiating the money and were trying to get $25 million ($23.8 million new and $1.2 million old).  Attarian told Woerth that Migliore would brief Woerth on the other issues – he mentioned waivers, and settlement of other claims.  Woerth Depo. at 43-49, 54.  When Attarian returned to D.C., he told Woerth, "We've gone as far as we're going to go" on the money, and that other open issues remained.  Woerth Depo. at 61-62.

After Kline returned to his office on February 7, 2003, he called Migliore – or Migliore

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

called him – to speak about "the data requirements" relating to the list of pilots and the seniority lists, which had been discussed in the 2-on-2 meeting.  Kline also got in touch with Kierce, whom Kline stated had a "running dialog" with Haddock for the next month or so "in terms of satisfying Mr. Haddock's needs."  The parties agreed during that portion of Kline's testimony that during the period immediately following the mediation, ALPA continued to work on the "matrix" for distribution of the settlement funds.  Tr. at 243-248 (Kline).

Migliore testified that during the period immediately following the mediation, representatives from ALPA and EWA continued to work on the distribution matrix.  He stated that they were "working to clean up the seniority list, which would be used as part of a distribution matrix to eventually distribute money, if we ever got to an agreement."  According to Migliore, they did this despite not having reached a final agreement, "because we were hoping to get to an agreement, and we would need to do that in order to distribute money, if and when we ever got to an agreement."  Tr. 425-426 (Migliore).

During February and March of 2003, Haddock worked with Englert on refining the matrix that would be used to distribute the monetary settlement.  Haddock testified that some time near the end of March 2003, he realized that the $23.8 million would not be distributed.  Haddock Depo. at 102-103.

Grant recalled only one conversation he had with anyone from ALPA following the mediation.  Granof had called him on February 10, basically saying, "Sorry I missed you [at the mediation] – give me a call."  Grant did end up talking to Granof, and it was more of a personal conversation.  Grant recalled Granof saying something like, "Glad we got it done, glad it worked out," and Grant said something equivalent, and that was that.  Grant Depo. at 132-133.

Kline testified that during this period (February of 2003, when the data requests were being exchanged and satisfied, between EWA and ALPA), neither Migliore nor Haddock ever said at any time that there was not a final settlement.  Tr. at 249, 251 (Kline).

On February 14, 2003, Kline sent Migliore another draft of the proposed settlement agreement.  Exh. D-6.  Kline said he had no reason at that point to believe that the "settlement agreement reached on February 5th" would not be implemented by ALPA.  Tr. at 251 (Kline).

37

United States District Court

For the Northern District of California

1    Migliore recalled receiving this draft on February 14, 2003, and testified that he was expecting

2    to receive the revised draft because Kline had told him to expect it.  Tr. at 424-435 (Migliore).

3    Kline admitted that this revised draft agreement did not state that the settlement agreement

4    had previously been approved.  Tr. at 290 (Kline).

5           On February 28, 2003, Migliore advised Kline there might be legal problems with the

6    release.  Tr. at 336 (Kline).  Migliore called Kline, and indicated that there was a lawsuit either

7    filed or about to be filed, and he also indicated that he had retained outside counsel to

8    represent ALPA in that suit.  Tr. at 251-252, 333-334 (Kline).  According to Kline, Migliore told

9    him for the first time that "there was a problem in the settlement document, settlement

10   agreement," in that "the settlement would require or the agreement they had would require

11   people who opted out of the settlement and retained their right to sue EWA in other forums

12   would not . . . benefit under the effects agreement that had been reached."  Nevertheless,

13   according to Kline, Migliore did not say that ALPA was "withdrawing" from the "settlement

14   agreement that had been reached on February 5" or from "the outcome of the February 5,

15   2003, negotiations."  Tr. at 252-253 (Kline).

16          Migliore also testified about this conversation, in which he explained to Kline that he

17   saw problems with the proposed release.  The first problem was that the company was trying

18   to coerce pilots into giving up the outside claims that ALPA did not have the authority to settle

19   on their behalf, in return for receiving collective bargaining proceeds.  The second problem

20   was that the proposed release would create a DFR problem for ALPA because ALPA's

21   actions would not be reviewed under the DFR deferential standard.  Migliore added that he

22   had not realized "until we got a revision and it was reviewed by people in addition to myself"

23   that one result of the waiver and release set forth in EWA's draft settlement document would

24   be that pilots who did not agree to sign the waiver and release would nonetheless be barred

25   from pursuing a grievance on their own (without ALPA's assistance).  Tr. at 426-434

26   (Migliore).

27          According to Kline, when he reported his conversation with Migliore to EWA, he was

28   told to "deal with Mr. Migliore and try to convince him that the settlement was in place and was

38

United States District Court

For the Northern District of California

valid the way it was agreed to on February 5th."  About a week and a half later – on March 11, 2003 – Kline sent Migliore an e-mail indicating that while he (Kline) did not have authority to present a proposal, he offered Migliore a "what-if" in order to "try to address his need."  Kline suggested a plan whereby even pilots who did not opt in to the settlement would receive some money out of the settlement pool – a minimal amount, whether or not they signed the waiver. "Everyone would get X dollars as part of the effects settlement, whether they signed a waiver or not.  The waiver would only be between the Company and pilots."  He asked Migliore his thoughts.  Exh. D-36; Tr. at 254-259, 337-339 (Kline).  Kline testified that this was not a "counterproposal," but was "a methodology to salvage what I saw as the agreement beginning to come apart," made "on a lawyer-to-lawyer basis."  Tr. at 256-259 (Kline).

The same day, Migliore responded to Kline's two-tiered proposal.  Migliore advised Kline, "We strongly believe that the outside lawsuits are not within ALPA's collective bargaining bailiwick and are accordingly outside of our collective bargaining discretion."  In addition, he stated that "DFR deference strongly counsels against such a waiver being wrapped into the settlement of this collective bargaining matter."  Exh. D-34; Tr. 340-341 (Kline).

On March 14, 2003, the complaint in Rachford v. Emery Worldwide, C-03-1103 PJH ("Rachford I") was filed, for the purpose of stopping the arbitration that was set to begin on March 24, 2003.  Kline received a copy of the Rachford I complaint from ALPA on March 17, 2003.  On March 27, 2003, counsel for ALPA wrote Kline a letter proposing putting the settlement money in escrow and dismissing the shut-down grievance until court had ruled in the Rachford I suit.  Migliore also sent Kline an e-mail.  Tr. at 350-353 (Kline); Tr. at 440-441 (Migliore).

On March 27, 2003, Migliore sent Kline a letter on ALPA letterhead containing a "settlement offer."  Exh. D-7; Tr. at 440 (Migliore).  In the letter, Migliore stated that ALPA was willing to put the settlement funds in an escrow account "until legal challenges, if any, to this settlement are resolved."  However, he stated that ALPA would not agree "to the inclusion of any matter in this settlement relating to outside litigation involving state law statutory claims or

United States District Court

For the Northern District of California

WARN Act claims." He also stated that if ALPA did not receive a response by March 31, 2003, ALPA would take steps to reschedule the arbitration of the shutdown grievance.

On March 31, 2003, Kline wrote a letter stating that EWA rejected ALPA's settlement offer, Tr. at 265 (Kline), because "[i]n my view there is nothing pending for EWA to either accept or decline." Kline's letter continued, "On February 5, 2003, Howard Attarian and Don Fausset, representing ALPA and EWA, respectively, effectively concluded an effects agreement with respect to the December 2001 shutdown of EWA. The effects agreement contained specific terms and conditions, including a requirement that every pilot participating in the $23.8 million settlement would release EWA, its affiliates and parents, from pending or future litigation over employment-related matters." Exh. D-8.

On April 4, 2003, Migliore wrote a letter responding to Kline's claim that EWA and ALPA had already "effectively concluded an effects agreement with respect to the December 2001 shutdown of EWA." Exh. D-9. Tr. at 442 (Migliore). Migliore stated that the waiver provision was "legally flawed" and therefore unacceptable to ALPA. He explained that "[t]he law imposes upon ALPA obligations under the duty of fair representation and the LMRDA that we do not believe would permit us to preclude relief for claims under the collective bargaining agreement and subcontracting sideletter for pilots who refuse to waive any and all other noncontract claims, such as state statutory whistle-blower claims and any individual statutory employment or civil rights claims." He stated further that there was no final settlement because final settlement terms were never agreed to, noting that a number of outstanding issues remained unresolved after the conclusion of the San Francisco mediation.

Migliore says that during this entire period from the end of the mediation session on February 5, 2003, through March of that year, Kline never said there was a final settlement, and never said there was an agreement on the scope of the waiver. Tr. at 439-443 (Migliore).

Kline stated at the hearing, in response to questioning by the court, that in his opinion, the settlement agreement was final as of February 5, 2003, and that it included the monetary settlement and the provisions in the final settlement agreement, including the waiver and release. He claimed that EWA simply "adopted" Migliore's "suggestions" after February 5.

United States District Court

For the Northern District of California

1    He conceded that the fact that there would be a release was a material condition, and stated

2    that EWA was prepared on February 5 to "make changes to the scope of the release."  Tr. at

3    267-269 (Kline).

4         Kline testified that during the period between March 1, 2003, and March 11, 1003, he

5    had a number of conversations with Migliore – and later, beginning in mid-March, he, Migliore,

6    and ALPA's counsel Stephen Berzon ("Berzon"), had at least three conversations regarding

7    whether the waiver and release was "legal," and that at no time did either Migliore or Berzon

8    say there was no settlement on February 5.  Tr. at 260-263 (Kline).  However, he also testified

9    that he never affirmatively said to them, "But we have a final settlement agreement."  Tr. at

10   354-355 (Kline).

11        Kline asserted that "the basic condition was, and what we put the money on the table

12   for was, the fact that there would be a release.  And we were prepared to tweak."  He agreed

13   that the only thing that was entirely agreed upon was the amount of the money.   He stated,

14   "The tweaking that I had proposed, at least in the form of a suggestion to Mr. Migliore, that the

15   settlement provide for money for even the opt-outs.  It wouldn't have affected anything to do

16   with the February 14 document, because the waiver and release would still have been in place

17   as well as the final settlement agreement would still have been in place."  However, Kline

18   stated, after Berzon was retained by ALPA, "the complexity of the problems that Mr. Berzon

19   foresaw in the settlement release was much greater than we had contemplated.  And that

20   reallocation suggestion that I had made would not have accommodated the subsequent

21   problems as identified by Mr. Berzon."  Tr. at 269-271 (Kline).

22                                   **THE LAWSUITS**

23        Following the above-described events – the furloughs and lay-offs of the flight crew

24   members, the arbitration of the August 2001 grievance, the February 2002 mediation session,

25   and the February 2003 mediation session – several lawsuits were filed, including Rachford I,

26   in which former EWA flight crew members seek a declaration of their rights to present

27   personally their claims for damages for loss of employment, including the loss of employee

28   benefits, in whatever forum jurisdiction is properly found; Rachford v. Emery Worldwide, C-03-

United States District Court

For the Northern District of California

1  3618 PJH ("Rachford II"), a proposed class action, in which former EWA flight crew members

2  seek a finding that ALPA did not enter into a settlement of the shutdown grievance, which the

3  plaintiffs in Rachford I seek to prosecute personally; and Air Line Pilots Assn., Int'l v. Emery

4  Worldwide Airlines, Inc., C-03-1449 PJH ("ALPA"), in which ALPA seeks a determination of

5  whether the parties did in fact reach a settlement of the shutdown grievance, and also seeks

6  an order compelling arbitration of the shutdown grievance.

7         EWA filed a motion to dismiss Rachford II, arguing, in part, that it had reached a

8  settlement of the shutdown grievance with ALPA.  EWA asserted that the EWA-ALPA

9  "settlement" was the culmination of "effects bargaining" required under the RLA and which had

10  commenced in August 2001.  EWA contended that those negotiations resulted in the

11  resolution of all "major" and "minor" disputes between ALPA and EWA, including matters

12  relating to the "effects" of EWA's cessation of operations on its pilots ("major"), and the

13  settlement of all pending and future grievances that ALPA had or could raise against EWA

14  ("minor").  Plaintiffs argued in opposition to EWA's motion that while ALPA and EWA may

15  have reached a "settlement" of the grievance, ALPA was not authorized to enter into such a

16  settlement.  ALPA, also a defendant in the case, argued that no settlement had been reached.

17         On May 12, 2004, the court heard argument in a motion for leave to file an amended

18  complaint in ALPA, and a motion for leave to file a second amended complaint and three

19  motions to dismiss in Rachford II.  In both motions, a central disputed issue was whether EWA

20  and ALPA had reached a settlement of the January 31, 2002, shutdown grievance.

21         EWA argued that the parties had reached agreement on all issues, including the

22  monetary amount of the settlement and provisions relating to a civil litigation waiver and

23  release of all claims by the flight crew members.  ALPA asserted that the parties had reached

24  agreement on some but not all of the terms of the settlement, and that issues relating to the

25  waiver and release were still open for negotiation.  In an order filed May 28, 2004, the court

26  ordered limited discovery, and scheduled a date for an evidentiary hearing, on the sole issue

27  of whether a settlement had been reached.

28

**United States District Court**
For the Northern District of California

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Railway Labor Act governs the formation, construction, and enforcement of labor-management contracts between air carriers and their employees.[10]  The RLA requires carriers and employees to make reasonable efforts "to make and maintain" collective bargaining agreements.  45 U.S.C. § 152 (First).  It extends to disputes concerning the making of collective bargaining agreements, as well as to grievances arising under existing agreements.  Norfolk and Western Ry Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117, 132 (1991).

EWA is an air carrier governed by the RLA, and ALPA is a union certified to represent EWA's pilots.  Because defendants[11] assert that an agreement was reached to resolve a grievance brought pursuant to a collective bargaining agreement governed by the RLA, the court's interpretation of the parties' attempt to settle the grievance is governed by federal common law and guided by the general common law of contracts.  See Local 107 Office & Prof. Employees Int'l Union v. Offshore Logistics, Inc., 380 F.3d 832, 834 (5th Cir. 2004).

The question the court must resolve is whether EWA and ALPA reached an enforceable agreement to settle the January 2002 shut-down grievance.  A settlement agreement is a type of contract.  Like any contract, a settlement agreement is a bargain in which there must be a manifestation of mutual assent to the material terms of the agreement.  See Restatement (Second) of Contracts §§ 1, 17(1), 18; see also Ass'n Mexican-American Educators v. State of California, 195 F.3d 457, 464 (9th Cir. 1999) ("a contract represents a 'meeting of the minds'"); Callie v. Near, 829 F.2d 888, 891 (9th Cir. 1987) (formation of agreement requires "agreement on all its material terms").

Thus, in order to establish the existence of an enforceable agreement, defendants must establish that both EWA and ALPA assented to be bound.  E. Allan Farnsworth, Contracts

---

[10]  Air carriers and their employees were made subject to the RLA in 1936.  45 U.S.C. §§ 181, 182.

[11]  EWA refers in its papers to "defendants" EWA, EWW, and CNF.  These are the defendants in the ALPA case (No. C-03-1449 PJH).

United States District Court

For the Northern District of California

1   (1982) § 3.1.  Assent to the formation of the contract must be manifested in some way, by

2   words or other conduct, to be effective.  Id.  The existence of mutual consent is determined

3   according to an objective standard applied to external manifestations or expressions.  Id.

4   § 3.6.  Where the parties have not agreed to all the essential terms, no binding contract exists.

5   Roth v. Garcia Marquez, 942 F.2d 617, 627-28 (9th Cir. 1991).

6         In addition, the agreement must be sufficiently definite to be enforceable.  The

7   requirement of definiteness is "implicit in the principle that contract law protects the

8   promisee's expectation interest."  Farnsworth § 3.1.  In order to determine contract

9   damages, or to order specific performance or injunctive relief, a court must determine the

10  scope of that promise with some precision.  Id.; see also Inamed Corp. v. Kuzmak, 275

11  F.Supp. 2d 1100, 1120 (C.D. Cal. 2002) (to be enforceable, a promise must be sufficiently

12  definite that a court can determine the scope of the duty and the limits of performance must be

13  sufficiently defined to provide a rational basis for the assessment of damages) (citations and

14  quotations omitted).

15        The participants in the February 5, 2003, mediation session bargained over six issues

16  – the amount of the settlement fund; the mechanics of the allocation of the settlement monies;

17  the rehiring obligations of EWA and its affiliates in the event of a start-up of the airline; the

18  termination of the CBA; the termination of the bargaining relationship between ALPA and

19  EWA; and the scope of a civil litigation waiver and release to be signed by the individual pilots

20  as a condition to receiving monies from the settlement fund.

21        During the course of the February 5, 2003, mediation session, the parties agreed to

22  payment by EWA of a settlement amount of $23.8 million, to be allocated among the

23  participating pilots by ALPA.  This amount, combined with the $1.2 million awarded to ALPA

24  by Arbitrator Harris, brought to $25 million the amount that EWA agreed it would pay ALPA (to

25  be distributed to the pilots).  The parties also agreed that in the event EWA or any of its

26  affiliates (including CNF) launched a new air carrier at any time prior to September 2007,

27  eligible former EWA pilots would be rehired.  The parties understood that once they had

28  agreed to a settlement of the shutdown grievance, the CBA would be terminated, as would the

United States District Court
For the Northern District of California

1    bargaining relationship between EWA and ALPA.

2        The parties dispute whether they reached agreement on the civil litigation waiver and

3    release.  The parties agree that the scope of the civil litigation waiver and release was a

4    material term of the purported agreement to settle the shutdown grievance.  Thus, in order to

5    establish that there was an enforceable final settlement which included the civil litigation

6    waiver and release, defendants must show that both parties agreed to a specific form of

7    waiver and release.

8        Defendants argue that ALPA and EWA entered into a binding effects agreement on

9    February 5, 2003, which was subject to a condition subsequent.  In their post-hearing brief,

10   defendants describe this condition subsequent as "construction of the [settlement]

11   agreement's litigation waiver and release to maximize ALPA's protection from inevitable

12   claims by disgruntled members that ALPA had breached its duty of fair representation to its

13   members."  Alternatively, defendants suggest that the condition subsequent was the

14   determination of the legality of the actual waiver and release contained in the draft settlement

15   agreement prepared by EWA.

16       ALPA, on the other hand, asserts that there was no final settlement, for three reasons.

17   First, ALPA contends that there are no objective indicia of agreement to a final settlement –

18   no signed document, and no other evidence of assent to all terms of a final settlement.

19   Second, ALPA asserts that Woerth never approved a final settlement agreement – a

20   requirement under ALPA's constitution and bylaws.  Third, ALPA argues that the parties did

21   not agree on the scope of a waiver/release, and there was accordingly no meeting of the

22   minds on all material terms of the agreement.

23       Having considered all the evidence presented and the applicable legal authority, the

24   court finds that EWA and ALPA did not reach agreement on a final settlement of the January

25   2002 shutdown grievance because they did not at any time agree on the scope of the civil

26   litigation waiver and release.  The evidence shows that the participants in the Dallas 2002

27   mediation discussed the possibility and the advisability of including a waiver and release

28   provision.  From the limited evidence presented, it appears that both the EWA representatives

United States District Court

For the Northern District of California

1   and the ALPA representatives viewed a waiver and release – in theory – as an advisable or

2   even a necessary element of any final settlement of the shutdown grievance.

3          However, the evidence reflects that the parties reached no agreement on that issue in

4   Dallas or during the period between the Dallas mediation and the February 2003 mediation in

5   San Francisco.  Tr. at 168, 277 (Kline); Tr. at 386 (Migliore); Tr. at 43 (Attarian); Granof Depo.

6   at 49-53.  Kline admitted that the parties had not agreed on any term of a settlement prior to

7   February 5, 2003.  Tr. at 175, 277-279 (Kline).  Moreover, the scope of the waiver and release

8   discussed during the Dallas negotiations was different from scope of the waiver and released

9   proposed by EWA in its draft settlement document presented during the San Francisco

10  mediation.  Thus, when EWA presented ALPA with the draft settlement document in the

11  afternoon of February 5, 2003, the ALPA negotiators had not yet had an opportunity to

12  consider whether ALPA would agree to the form of waiver and release contained in that

13  settlement proposal.

14         In Dallas, ALPA had disclosed its concerns to EWA regarding the so-called Burley

15  problem – that is, a number of pilots had informed ALPA that they did not want the union to

16  represent them in settlement talks regarding the shutdown grievance, and ALPA was

17  concerned that it might not have authority to settle for those pilots.  ALPA suggested an "opt-

18  in/opt-out" waiver as the best way to address this problem.  Tr. 384-385 (Migliore); Tr. 278-

19  279 (Kline); Exh. D-1 at 11-0250 to 11-0258.  Pursuant to this form of waiver, a pilot who

20  opted out of a settlement could still proceed with a grievance through the System Board.  Tr. at

21  385-386 (Migliore); Tr. at 279 (Kline); Exh. D-1 at 11-0250, 11-0255; see also Granof Depo at

22  51-52 (explaining his understanding prior to the San Francisco mediation that EWA was

23  interested in a waiver similar to the opt-in/opt-out waiver described by ALPA at the Dallas

24  negotiation, not one that would prohibit pilots from pursuing grievances if they did not

25  participate in the settlement).

26         By contrast, the waiver and release presented as part of the draft settlement document

27  in the San Francisco mediation would not have permitted pilots who opted out of a settlement

28  to pursue their shutdown grievance.  Exh. D-3; Tr. at 310-311 (Kline).  Moreover, the WARN

United States District Court

For the Northern District of California

1    Act case and the whistle-blower case had not been filed as of the time of the Dallas

2    mediation, and waiver of such outside statutory claims was therefore not within the

3    contemplation of the parties, as it clearly was in the San Francisco mediation.

4           The parties agree that no temporary agreement was signed at the conclusion of the

5    February 5, 2003, mediation session, and that Woerth never signed an agreement settling the

6    grievance or approving the terms of a settlement agreement.  Woerth himself testified that he

7    did not approve a final settlement.  EWA was aware that ALPA's constitution requires

8    approval of the President to any agreement.  EWA was also aware (as EWA had drafted the

9    proposed settlement document) that the settlement document stated that the settlement was

10   subject to presidential approval.

11          However, the court finds the lack of a signed agreement to be less significant overall

12   than the fact that the parties did not objectively manifest agreement to the scope of any

13   proposed waiver and release.  Thus, they never reached a meeting of the minds on all the

14   material terms of the agreement.  It is a general rule of contract law that where an essential

15   element is reserved for the future agreement of both parties, the promise can give rise to no

16   legal obligation until such future agreement.  "Since either party by the terms of the promise

17   may refuse to agree to anything to which the other party will agree, it is impossible for the law

18   to affix any obligation to such a promise."  In re Vylene Enter., Inc., 90 F.3d 1472, 1476 (9th

19   Cir. 1996).  The scope of the waiver and release was an essential term of any settlement

20   agreement, which was left for future negotiation.  Thus, parties did not agree on all material

21   terms of the settlement.

22          This is not a case of two parties agreeing to dispense with agreement over the precise

23   content of a particular substantive term.  See, e.g., Eastern Air Lines v. Air Line Pilots Ass'n

24   Int'l, 861 F.2d 1546, 1551 (11th Cir. 1988) (agreement to dispense with "mutual assent" over a

25   given term is itself a product of "mutual assent").  ALPA never explicitly or implicitly agreed to

26   the proposed waiver and release or to every provision set forth in the draft settlement

27   document, and never agreed to a final settlement of the grievance, with the details of the

28   waiver and release to be determined later.

47

United States District Court

For the Northern District of California

1   At most, some of the ALPA representatives indicated their understanding – both at the

2   time of the Dallas mediation, and in the San Francisco mediation – that any settlement would

3   likely include a provision for a waiver and release.  However, no one from the ALPA team ever

4   agreed to the terms and scope of such a waiver and release.  Moreover, the evidence shows

5   and both sides agree that the parties did not discuss the specifics of the waiver and release

6   with the mediator during the February 2003 mediation, and that the mediator focused her

7   efforts on helping the parties reach agreement on the monetary amount of the settlement.

8   There is no evidence that the parties bargained over any subject apart from the

9   monetary settlement during the morning session.  From approximately 2:30 p.m. (shortly after

10   the commencement of the afternoon session), when Fausset instructed Jacobsen to convey to

11   ALPA the offer of $20 million in "new money," and also directed her to convey EWA's draft

12   settlement document to ALPA, until approximately 5:30 p.m., when Fausset agreed to ALPA's

13   monetary demand of $23.8 million in "new money," the focus of the bargaining was on

14   reaching agreement on the amount of the monetary settlement.

15   The evidence shows that when Fausset authorized Jacobsen to convey the $20 million

16   offer and the draft settlement document to ALPA, Fausset told Jacobsen that EWA expected

17   ALPA to sign a "full release" and that the EWA representatives understood there needed to be

18   "some tweaking between the parties."  Before leaving the EWA meeting room, Jacobsen told

19   Fausset that if the ALPA negotiators found EWA's monetary offer "in the ballpark," they would

20   need to discuss it with Woerth.

21   Jacobsen communicated the $20 million offer to ALPA after she left the EWA meeting

22   room at 2:35 p.m.  At the same time, she handed the draft settlement document to Migliore,

23   telling him it included a rough draft of the waiver language, and that the lawyers were going to

24   have to work on it.  There is no evidence, however, that Jacobsen discussed with the parties

25   any of the specific provisions of the draft settlement document, or that she did anything other

26   accept the document from the EWA representatives and hand it over to the ALPA

27

28

48

1    representatives.[12]

2        As of the time the ALPA negotiators concluded the telephone call to Woerth –

3    approximately 3:30 p.m., no agreement had been reached on any issue.  During the next two

4    hours, the two teams continued to negotiate the amount of the monetary settlement.  When

5    Fausset and Attarian met with Jacobsen in the "woodshed" at 4:21 p.m., the discussion was

6    focused entirely on the monetary amount.  Following the "woodshed" meeting, the bargaining

7    continued with regard to the amount of the settlement.  After Fausset had agreed to ALPA's

8    $23.8 demand, Jacobsen told the ALPA reps, "They've met your $23.8 million" (or words to

9    that effect).  The parties then met jointly to congratulate each other on successfully negotiating

10   the monetary settlement.

11       At some point – whether in the 3:30 p.m. meeting between Kline, Fausset, and Migliore

12   (which Migliore testified did not occur), or in the 2-on-2 meeting that followed the agreement

13   on the monetary settlement amount – the parties agreed on the provision regarding rehiring of

14   ALPA pilots in the event that EWA resumed flight operations.  However, the evidence shows

15   no substantive discussion of the scope of a proposed waiver and release at any time during

16

17       [12] Prior to the evidentiary hearing, defendants sought to depose Jacobsen, who lives in

18   the State of Washington.  On September 23, 2004, U.S. District Judge Marsha J. Pechman, of
     the Western District of Washington, heard a motion for a protective order asserting a claim of

19   privilege and seeking a ruling with regard to the effect of any privilege on the permissible scope
     of questioning in the deposition.  Without ruling definitively on the claim of privilege, Judge

20   Pechman set limits on the scope of the questioning, finding, "[T]hings that are privileged are what
     was said behind closed doors, either by the mediator or to the mediator, and what her

21   impressions were of what was said."  She instructed the parties that they could take Jacobsen's
     deposition, and could ask about "for example, what her common practice is [and] when she left

22   [and] who was there" but that they could not ask about "what was said in those [closed] rooms."
     Transcript of September 23, 2004, hearing, at 4.  Judge Pechman also instructed that Jacobsen

23   provide written responses to two questions – Was there an agreement? and What were the terms
     of the agreement? – and that the responses be placed under seal for the use of this court, at its

24   discretion.  Counsel presented the sealed Jacobsen declaration to this court at the evidentiary
     hearing.

25       With regard to the deposition itself, neither side has raised any objection to Judge

26   Pechman's ruling, and both sides cite the deposition transcript. This court accepts the deposition
     on the same basis.  Thus, the court has considered all of Jacobsen's testimony with the exception

27   of her opinion as to the ultimate question.  As to the ultimate question – whether there was a
     settlement agreement – the court has not reviewed the sealed written responses, and does not

28   consider Jacobsen's opinion as to that question relevant to the decision. The declaration remains
     under seal and part of the court file for any appellate purposes.

United States District Court
For the Northern District of California

1   the mediation.  The subject does not even appear to have been mentioned until the 2-on-2

2   meeting, which occurred after Jacobsen had departed the hotel.  There is no evidence that the

3   ALPA representatives objectively manifested assent to the waiver and release provision

4   during the course of the mediation.

5          The parties' continued negotiations following the February 5, 2003, mediation

6   demonstrate that neither ALPA nor the company considered that an agreement on waiver and

7   release had been reached on February 5, 2003.  There is no evidence of any agreement

8   during the period immediately following the mediation.  The evidence shows a continuing

9   course of negotiation – but no objective manifestation of agreement to the waiver and release.

10         EWA argues that the parties reached a binding agreement on February 5, 2003, with a

11  determination of the legality of the waiver and release as the only condition that could excuse

12  performance by ALPA.  However, EWA's argument regarding the "condition subsequent"

13  would be relevant only if EWA were able to establish that ALPA and EWA reached a meeting

14  of the minds as to all material terms of the contract prior to the 2-on-2 meeting on February 5,

15  2003, and that ALPA's president actually or implicitly agreed to each of those terms.

16         EWA cannot show that there was a meeting of the minds as to all material terms of the

17  settlement agreement, because the evidence shows that the parties did not agree on the

18  scope of the waiver and release.  There is no evidence that the EWA representatives

19  objectively expressed that the draft settlement document presented to ALPA during the San

20  Francisco mediation was intended as a final statement of the terms of settlement of the shut-

21  down grievance.  Indeed, Kline admitted that the scope of the waiver and release was not final

22  as of February 5, 2003, and that the waiver and release remained subject to change after that

23  date.  Tr. at 268-269 (Kline).  In addition, ALPA made no proposal regarding the scope of a

24  waiver and release when Attarian gave Jacobsen ALPA's demand for 23.8 million after the

25  3:06 p.m. telephone call to Woerth, and there is no evidence showing that ALPA accepted the

26  waiver and release term of EWA's draft settlement proposal at any time.

27                                    **CONCLUSION**

28         In accordance with the foregoing, and based on all the evidence presented, the court

1  finds that the parties did not agree on a final settlement of the January 2002 shutdown

2  grievance.

3       The parties shall meet and confer, and shall submit, no later than July 6, 2005, a joint

4  status statement and a stipulation either setting a date for a further case management

5  conference, agreeing to proceed to arbitration, or setting forth a briefing schedule with regard

6  to any further motions they believe to be necessary.

7

8  **IT IS SO ORDERED.**

9  Dated:  June 14, 2005

10                                            _____
                                                        /s/
                                             PHYLLIS J. HAMILTON
11                                           United States District Judge

**United States District Court**

For the Northern District of California